*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0158p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
———————————

MOIEN LOUZON,

　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

FORD MOTOR COMPANY,

　　　　　　　*Defendant-Appellee.*

No. 11-2356

> —————————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-11205—Sean F. Cox, District Judge.

Argued: April 25, 2013

Decided and Filed: June 4, 2013

Before: MOORE and STRANCH, Circuit Judges; and HOOD, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. William B. Forrest III, KIENBAUM OPPERWALL HARDY & PELTON P.L.C., Birmingham, Michigan, for Appellee. **ON BRIEF:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. William B. Forrest III, Elizabeth Hardy, Julia Turner Baumhart, KIENBAUM OPPERWALL HARDY & PELTON P.L.C., Birmingham, Michigan, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. In June 2007, Plaintiff-Appellant Moien Louzon ("Louzon"), a product engineer at Defendant-Appellee Ford Motor Company ("Ford"), took an approved leave of absence from Ford to visit family in Gaza.

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

While abroad, security issues in the region caused Israel to close its borders, making it impossible for Louzon to return to the United States prior to the end of his leave. Ford initially extended his leave, but by the time the State Department was able to evacuate Louzon in August 2007, the extension had expired. When Louzon returned to work on August 31, 2007, he learned that Ford had terminated him in the interim.

In 2009, Louzon filed a civil action against Ford, alleging age and national-origin discrimination, as well as retaliation. After its motion for summary judgment was denied in 2010, Ford filed a motion in limine seeking to exclude Louzon's evidence of comparable employees on the basis that none were similarly situated as a matter of law. The district court granted Ford's motion and sua sponte issued an order to show cause why summary judgment should not issue. Louzon conceded that without any evidence of similarly situated employees, he could not succeed on his discrimination claims, and the district court granted summary judgment to Ford. Louzon appeals the district court's in-limine ruling and the subsequent summary-judgment order, as well as two discovery rulings issued earlier in the proceedings.

Because we agree with Louzon that the district court improperly considered non-evidentiary issues in-limine, we **REVERSE** the district court's in-limine ruling as to evidence of Louzon's comparators, **VACATE** the district court's grant of summary judgment to Ford on Louzon's age and national-origin discrimination claims and the district court's denial in part of Louzon's September 11, 2009 motion to compel, and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the district court's denial in part of Louzon's February 10, 2010 motion to compel.

## I.  BACKGROUND

Louzon was a product engineer in Ford's Powertrain Controls Department at the time of his termination in 2007. R. 67-2 (Bailey Decl. at ¶¶ 2, 3) (Page ID #1583). In March 2007, Louzon approached Mary Ann Kantrow and Marianne Vykydal, two of his supervisors, about taking a four-week leave of absence to begin on May 31 so that he could visit his mother in Gaza. R. 68-6 (Kantrow Tr. at 20:16–25) (Page ID #1738); R.

68-9 (Vykydal Tr. at 30:1–7) (Page ID #1765). Louzon also spoke with another of his supervisors, Owen Bailey, a manager in the Powertrain Controls Department. R. 67-2 (Bailey Decl. at ¶ 2) (Page ID #1583). Bailey testified that he was first made aware of Louzon's request for leave a few days before it was to begin and that he decided to approve a three-week leave rather than a four-week leave. R. 68-3 (Bailey Tr. at 22:22–24:14) (Page ID #1687). Louzon commenced his trip as planned. R. 68-4 (Louzon Tr. at 31:7–10) (Page ID #1707).

While Louzon was abroad, "[d]ue to the worsening security situation . . . and subsequent border closings in June, American citizens, mostly dual nationals, in Gaza were unable to depart without United States Government assistance." R. 68-16 (State Department Letter at 1) (Page ID #1839). During this time, Louzon contacted various government agencies requesting assistance. For example, Louzon emailed the American consulates in Jerusalem and Tel Aviv on June 21 and again on July 1 and July 2. R. 68-10 (Emails at 3, 11–12) (Page ID #1771, 1779–80). In these emails, Louzon explained that he had "been calling daily for the past three week[s] to secure pass from Gaza to either Egypt or Jordan so I can fly back to USA." *Id.* at 12 (Page ID #1780). The State Department confirmed that "the U.S. Consulate General in Jerusalem was aware of Mr. Louzon and his family's presence in Gaza since June 2007, [but] they were only able to assist in their evacuation on August 23, 2007." R. 68-16 (State Department Letter at 1) (Page ID #1839).

Beginning in July, Louzon also started emailing Ford, updating the company on his status and asking for assistance. Although Ford heard about Louzon's inability to return to work in June from an employee who knew Louzon's brother, Louzon did not email Ford until July 4, when he explained that he was "st[u]ck and can not fly back to US due to Isr[ae]li sealed the border and I [asked] the US Embassy to evacuate me so I can fly back." R. 68-10 (Emails at 11, 21) (Page ID #1779, 1789). On July 9, Ford extended his leave of absence for forty-five days, until August 24. *Id.* at 22 (Page ID #1790). A few weeks later, Louzon emailed Kantrow, who in turn sought advice from Ford's Legal Office as to whether Ford could assist Louzon by contacting a consulate

on his behalf. *Id.* at 10 (Page ID #1778). On August 3, Louzon emailed Ford asking again for "a letter to be sent to the US consulate in Jerusalem that we need our employee to return back ASAP." *Id.* at 2 (Page ID #1770). Louzon also updated Ford on August 9 with news that he was "still st[u]ck waiting for US embassy evacuation schedule. The US embassy they told me today they are working on the evacuation and might be next week." *Id.*

On August 22, two days prior to the end of Louzon's approved extended leave, Leslie Harris, a Personnel Relations representative, sent Louzon a five-day-quit letter, which informed him that his continued absence from work was unauthorized and that "[f]ailure to return to work with satisfactory medical or other documentation or to provide this information within five (5) business days of the date of this letter will result in the termination of your employment as a 'voluntary quit.'" R. 68-15 (Five-Day-Quit Letter) (Page ID #1838). On August 24, the date by which Louzon was expected to return, Louzon sent an email to Kantrow and Bailey stating that he "was able to [exit] Isr[ae]l through American Isr[ae]l to Amman Jordan. I am working on reservation to fly back to USA ASAP [sic]." R. 68-10 (Emails at 2) (Page ID #1770). On August 28, prior to the expiration of the five business days allotted in the five-day-quit letter, Ford sent Louzon a letter informing him that he had been terminated as a "quit" pursuant to Ford's leave policies.[1] R. 52-9 (Termination Letter) (Page ID #1098). When Louzon returned to Ford on August 31, having not yet received either letter, he was informed that he had been terminated. R. 52-2 (Louzon Tr. at 322:12–18) (Page ID #1049).

On March 3, 2009, Louzon filed a civil action against Ford in the Third Circuit Court for the County of Wayne, State of Michigan. R. 1 (Notice of Removal at 1) (Page ID #1). Ford removed the action to the U.S. District Court for the Eastern District of Michigan on March 31, 2009. *Id.* Louzon alleged age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Elliott-Larsen Civil Rights Act ("ELCRA"); national-origin discrimination under Title VII and ELCRA; and retaliation.

---

[1]At oral argument, Ford asserted that the five-day-quit letter was sent to Louzon in error and that Louzon was actually terminated pursuant to the automatic-termination policy.

R. 1, Ex. A (Compl. at ¶¶ 8–9, 26–28) (Page ID #10–11, 13). There were several discovery disputes in the early phases of litigation, two of which are at issue in this appeal—Louzon's September 11, 2009 and February 10, 2010 motions to compel. R. 7 (Mot. to Compel) (Page ID #36); R. 34 (Mot. to Compel) (Page ID #597); R. 78 (Notice of Appeal at 1) (Page ID #2090). The district court granted in part and denied in part each of these motions. R. 44 (Order at 1) (Page ID #833); R. 59 (Order at 1) (Page ID #1522).

On July 22, 2010, District Judge Anna Diggs Taylor entered an order denying Ford's April 12, 2010 motion for summary judgment. R. 60 (Order at 1) (Page ID #1524). In December 2010, the case was transferred to District Judge Sean Cox. On April 26, 2011, Ford filed a motion in limine to exclude all evidence relating to the seven Ford employees that Louzon sought to proffer as comparators. R. 67 (Mot. in Limine at 1) (Page ID #1562). The district court granted Ford's motion and entered an order to show cause why summary judgment should not be granted in light of the in-limine ruling. *Louzon v. Ford Motor Co.*, No. 09–11205, 2011 WL 3566610, at \*13 (E.D. Mich. Aug. 12, 2011). Louzon conceded that he could not support his discrimination claims if the evidence of the seven employees were excluded, and the district court granted summary judgment on behalf of Ford. *Louzon v. Ford Motor Co.*, No. 09–11205, 2011 WL 4502741, at \*3–4 (E.D. Mich. Sept. 28, 2011). Louzon timely filed this appeal, challenging the denials of his motions to compel, the in-limine exclusion-of-evidence ruling, and the grant of summary judgment on Louzon's age and national-origin discrimination claims.[2] R. 78 (Notice of Appeal at 1) (Page ID #2090).

## II. STANDARD OF REVIEW

"We review a district court's ruling on a motion in limine for an abuse of discretion." *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 562 (6th Cir. 2012). Similarly, "[w]e review denials of motions to compel discovery for an abuse of discretion." *Evans v. Sir Pizza of Kentucky, Inc.*, 476 F. App'x 605, 608 (6th Cir. 2012).

---

[2]Although Louzon included the district court's grant of summary judgment on his retaliation claim in the Notice of Appeal, he did not pursue this issue in his briefs or at oral argument.

"An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Miller v. Countrywide Bank, N.A. (In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.)*, 708 F.3d 704, 707 (6th Cir. 2013) (internal quotation marks omitted).

### III.  MOTION IN LIMINE

Louzon appeals the district court's in-limine ruling excluding evidence pertaining to his claims of age and national-origin discrimination.  The district court determined that none of the seven comparators proffered by Louzon were similarly situated because there were material differences between Louzon and each of the comparators—namely, that they all reported to different supervisors.  *Louzon*, 2011 WL 3566610, at *6–10. Therefore, the district court concluded, all evidence relating to these comparators must be excluded under Federal Rules of Evidence 401 and 402.  *Id.*  In reaching this conclusion, the district court made both the legal determination that a comparator must have worked for the same supervisor as the plaintiff in order to be similarly situated and the factual finding that Bailey supervised Louzon.  *Id.* at *3–6.  In light of these determinations, Louzon argues that the district court not only considered issues improperly raised in limine, but also abused its discretion by resolving genuine issues of material fact.  Appellant Br. at 42–43.  We agree.

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984).  "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of material fact, a motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).  In other words, the motion in limine is an evidentiary device that "provides a useful adjunct to other devices for truncating the trial such as motions for summary judgment."  21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5037.10 (2005).

In criminal cases, by contrast, the pre-trial device of summary judgment is not available to litigants. For that reason, certain courts have held that in criminal cases a district court may consider non-evidentiary matters in connection with a motion in limine. For example, the Seventh Circuit held that a court in a criminal case "may, and generally should, block the introduction of evidence supporting a proposed defense unless all of its elements can be established." *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002) (internal quotation marks omitted). Nonetheless, in-limine rulings in civil cases serve a different, and more limited, purpose. The Supreme Court has recognized this distinction, explaining that "[i]n a civil action, the question whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment, but of course motions for summary judgment are creatures of civil, not criminal, trials." *United States v. Bailey*, 444 U.S. 394, 412 n.9 (1980).

In other words, a mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion. Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment. *See Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010) ("In light of their limited purpose, motions in *limine* should not be used to resolve factual disputes, which remains the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards.") (internal quotation marks omitted); *see also* 21 WRIGHT & GRAHAM, *supra*, § 5037.10 ("[T]he only parties willing to invest the time and money in making motions in limine on cases that may never go to trial are repeat players like insurance companies and prosecutors or deep pockets willing to spend money on scorched earth tactics to discourage impecunious plaintiffs.").

Our sister circuits that have addressed this issue have recognized these dangers and reversed the underlying decisions. For example, the Federal Circuit recently reversed a district court after it had "essentially converted [a] motion *in limine* into a

motion for summary judgment." *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012).  The Federal Circuit explained that "[i]n doing so, the court did not allow for full development of the evidence and deprived [the defendant] of an opportunity to present all pertinent material to defend against the dismissal of its inequitable conduct defense." *Id.*  The Third Circuit has also considered this issue, explaining that "the district court's procedure converted the *in limine* motion into one for summary judgment, but without the procedural protections of notice which the federal rules require before judgment on the merits may be granted." *Bradley*, 913 F.2d at 1070 (internal quotation marks omitted).  Finally, the Seventh Circuit affirmed a district court's denial of a motion in limine because "Mogi's argument that Mid-America could not prove its lost profits with reasonable certainty is an argument that goes to the sufficiency of Mid-America's evidence.  While this might be a proper argument for summary judgment or for judgment as a matter of law, it is not a proper basis for a motion to exclude evidence prior to trial." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996).

District courts in this circuit have reacted similarly, consistently disallowing litigants to raise non-evidentiary matters in limine.  *See, e.g.*, *Carver v. Petry*, No. 12–cv–131–JMH, 2013 WL 160277, at *2 n.1 (E.D. Ky. Jan. 15, 2013) ("In reality, the present issue is a dispute which would have been better presented during the period of discovery as either a motion to compel or a motion for a protective order."); *Hinkle v. Ford Motor Co.*, No. 3:11–24–DCR, 2012 WL 5868899, at *8 (E.D. Ky. Nov. 20, 2012) ("[T]he Court will not rule on this substantive issue in a motion *in limine*."); *Bell v. Prefix, Inc.*, No. 05–74311, 2009 WL 3614353, at *1 (E.D. Mich. Nov. 2, 2009) ("Normally, motions *in limine* are not proper procedural devices for the wholesale disposition of theories or defenses.") (internal quotation marks omitted); *Ohio Oil Gathering Corp. III v. Welding, Inc.*, No. 2:09–cv–782, 2010 WL 5135999, at *3 (S.D. Ohio Dec. 9, 2010) ("Defendant's motion is more a motion for judgment on the pleadings or for summary judgment . . . than it is a motion *in limine*.  The time for filing such dispositive motions has long closed, however, and Defendant cannot evade this Court's summary judgment deadline simply by captioning its dispositive motion in a

creative manner."); *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 873 (W.D. Mich. 2008) ("Defendants' motion does not raise questions of the admissibility of certain evidence or suggest that the jury would somehow be prejudiced by the evidence. Accordingly, there is no basis, as a motion in limine, for excluding this evidence.").

Here, the true nature of Ford's motion is evident from the first page, where Ford argues that as a matter of law, none of Louzon's proffered comparators "are properly comparable to [Louzon] because the various leave and termination decisions were made independently by separate decision makers that had absolutely no involvement in the decisions concerning [Louzon's] leave or termination." R. 67 (Mot. in Limine at 1) (Page ID #1562). Resolution of this issue—whether Louzon's evidence is insufficient as a matter of law—requires a summary-judgment analysis. FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). More important for the purposes of our analysis, though, is that Ford's motion does not require any rulings relating to the admissibility of evidence at trial.

Ford nonetheless attempts to infuse into this motion an evidentiary matter by arguing that this evidence was "irrelevant and inadmissible under Fed. R. Evid. 401 and 402 because that evidence does not make it any more or less probable that [Louzon] suffered national origin or age discrimination." R. 67 (Mot. in Limine at 1) (Page ID #1562). However, this argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings. Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant. Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered. *See Meyer*, 690 F.3d at 1378 ("Because we conclude that it was procedurally improper for the court to dispose of Bodum's inequitable conduct

defense on a motion *in limine*, we reverse the court's decision and remand for further proceedings.").

A review of the district court's order further illustrates the extent to which non-evidentiary matters were raised and resolved in limine. Furthermore, we agree with Louzon that the district court's resolution of these matters was flawed.[3] We are particularly concerned with the district court having employed an incorrect legal standard in evaluating Louzon's discrimination claim and having resolved genuine issues of material fact.

We turn first to the district court's reliance on an incorrect legal standard in assessing whether Louzon's proffered comparators were sufficient to satisfy his burden to establish a prima facie case. In its order, the district court focused on whether Louzon had established the fourth and final element of his prima facie case—that "he was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). In order to sustain his burden on this element, he must "demonstrate[] that a comparable non-protected person was treated better." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (internal quotation marks omitted).

The district court relied on *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992), for the proposition that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor." *Id.* at 583. However, we have since clarified *Mitchell*, explaining that the supervisor inquiry "'does not automatically apply in every employment discrimination case.'" *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (quoting *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)); *see also Arnold v. City of Columbus*, Nos. 11–3459, 11–3468, 11–3815, 2013 WL 628447, at *6 (6th Cir. Feb. 20, 2013) ("Factors to consider include whether the individuals dealt with the same

---

[3]In *Petty v. Metropolitan Government of Nashville & Davidson County*, 687 F.3d 710 (6th Cir. 2012), we similarly addressed a district court order that improperly considered non-evidentiary matters in limine. Unlike in our case, however, the district court's rulings in *Petty* were substantively correct, and we affirmed its order on that basis. *Id.* at 721.

supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (internal quotation marks and alterations omitted). In fact, "we have never read 'the "same supervisor" criteri[on]' as an 'inflexible requirement.'" *Bobo*, 665 F.3d at 751 (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479–80 (6th Cir. 2003)). Rather, a court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F.3d at 352. The district court thus employed a clearly erroneous legal standard that "was too narrow and necessitated an exact correlation not required by the law of this circuit." *Bobo*, 665 F.3d at 752 (internal quotation marks and alterations omitted).

Given the facts of this case, whether a comparator was working for the same supervisor should not be given significant weight. As explained by Bailey, there are approximately 5,000 product engineers in Product Development. R. 67-2 (Bailey Decl. at ¶ 2) (Page ID #1583). "The general management structure in each organization is that product engineers report to supervisors who, in turn, report to managers. There are more than 300 managers in [Product Development], all managing different departments within the separate business organizations." *Id.* In other words, the employee-to-manager ratio among engineers in Product Development is approximately 16:1, and the employee-to-supervisor ratio much lower. If we were to accept Ford's suggestion that the same supervisor is required in this case, the pool of potential comparators for Louzon would amount to no more than a few individuals. Such a requirement would render any plaintiff's burden virtually impossible, even at the prima facie stage.

Additionally, relying heavily on the same-supervisor factor in this case required the district court to make factual findings on contested issues. Specifically, the district court found that Bailey terminated Louzon under Ford's automatic termination policy because "it was Bailey who chose not to renew Louzon's leave." *Louzon*, 2011 WL 3566610, at *6. In reaching this conclusion, the district court made factual findings on

two critical issues: (1) the process by which Ford terminates employees and (2) who supervised Louzon.

In support of its argument that it employs an automatic termination policy, Ford relies heavily on the following statement in its Unpaid Personal Leave policy: "Failing to return on or before the 'Leave Ending Date' may result in termination as a voluntary quit effective the leave ending date." R. 67-4 (Ford Leave Policy at 3) (Page ID #1591). Based on this language, Ford contends, an employee who does not return on time from leave is automatically terminated. Appellee Br. at 29–30; *see also* R. 68-13 (Harris Tr. at 72:9–12) (Page ID #1825) (stating that Louzon "was processed as a voluntary quit as a result of failing to return from a personal leave of absence and that was an automatic from the policy"). However, Ford's interpretation is belied by the plain language of the policy—i.e., "may result." The district court's conclusion to the contrary was therefore error.

Even assuming there were an automatic termination policy, the import of such a policy remains disputed. Ford argues that because the determination is automatic, the supervisor who approves the length of the leave makes the termination decision. Appellee Br. at 17–18. The district court, having agreed with Ford's interpretation of the policy, was then prompted to resolve an important factual dispute: who supervised Louzon? *Louzon*, 2011 WL 3566610, at *6. Although the district court concluded that Bailey supervised Louzon, the evidence in the record shows that Louzon reported to several supervisors and that each of these supervisors, as well as many HR employees, were involved in approving Louzon's leave. For example, Kantrow made the entry in the system that authorized the extension of his leave of absence. R. 68-6 (Kantrow Tr. at 38:1–8) (Page ID #1741). In fact, Kantrow testified that Ford lists her as Louzon's supervisor in the Human Resources system. *Id.* at 40:1–2 (Page ID #1741). Additionally, as explained above, Louzon approached both Kantrow and Vykydal about taking a four-week leave. Finally, even Bailey admitted in his deposition that he "concurred" in the decision to extend Louzon's leave initially, which was made by

Human Resources and other management bodies. R. 68-3 (Bailey Tr. at 73:20–74:5) (Page ID #1694).

In addition to controverting Ford's evidence that Bailey supervised him, Louzon has presented evidence that places in dispute the mechanics of Ford's termination policy. Specifically, Louzon points to evidence that Harris made the decision to terminate Louzon rather than Bailey, which casts doubt on Ford's argument that its termination policy is automatic.[4]  In its response to Louzon's First Set of Interrogatories, for example, Ford answered Louzon's request for it to "[i]dentify the person who made the decision to terminate Moien Louzon as a quit" as follows:

> Plaintiff's termination was the result of Plaintiff's employment situation in June, July and August, 2007, which included Plaintiff's absence from work and his failure to return to work at the conclusion of his 30-day personal leave of absence and the application of the Personal Leave of Absence Policy to the situation. A number of individuals were involved in reviewing the situation and in the interpretation and application of Company policy to the situation, including Plaintiff's management, Human Resources and the Personnel Relations Office, which is within the Human Resources organization. Les Harris, Personnel Relations Representative, would have had the primary responsibility for review of the situation, policy review and application of any policy to the situation.

R. 68-21 (Answers to Interrogatories at 5–6) (Page ID #1945–46). There is also documentary evidence tying Harris to the termination decision. For example, on August 22, Harris emailed Michelle Bricker of Personnel and Organization Planning, informing her that he would "process the quit letter." R. 68-10 (Emails at 5) (Page ID #1773). Earlier that day, Harris told her that "I believe the personal leave of absence should be closed and a 5 day quit letter should be sent to his address of record. If he fails to respond he will be terminated per policy." *Id.* For these reasons, we disagree with the district court's conclusion that it is undisputed that Bailey terminated Louzon pursuant to an automatic termination policy.

---

[4]At oral argument, Ford asserted for the first time that even if Harris were construed as the supervisor, Louzon's discrimination claims could not succeed because there is no evidence in the record that any of the comparators were supervised by Harris. However, this argument is no more persuasive than Ford's argument in the briefs, as it is similarly based on the erroneous statement of law that a plaintiff must have been supervised by the same individual as his comparators.

The alternative basis for the district court's ruling—that the comparators proffered by Louzon were not similarly situated in all other relevant respects— fares no better, as it was an issue that had been previously litigated at the summary-judgment stage. In fact, the district court touched upon this very issue in its initial denial of summary judgment: "The motion has to be denied. The plaintiff, in the light most favorable, has presented evidence supporting the allegation that he was treated differently from Amro, who was similarly situated." R. 71 (Hearing Tr. at 30:11–14) (Page ID #2042).[5] Ford's motion for summary judgment further confirms that this argument, which the district court accepted, is an attempt to relitigate whether Amro was similarly situated to Louzon. *Compare* R. 52 (Mot. for Summ. J. at 11) (Page ID #1025) ("Here, Plaintiff cannot establish a *prima facie* case of disparate treatment because he cannot show that similarly situated individuals were treated differently."), *and id.* ("Amro's situation was different from Plaintiff's in a number of respects, including that he communicated with Ford at all times about his status and those in his supervision making the decisions regarding his leave status were different than the individuals involved in Plaintiff's situation."), *with* R. 67 (Mot. in Limine at 5) (Page ID #1572) ("Plaintiff here seeks to introduce evidence at trial of employment decisions by a host of different decision makers concerning employees that are not similarly situated to him as a matter of law."), *and id.* at 6 (Page ID #1573) ("Moreover, there are numerous additional 'differentiating circumstances' that render Amro non-similarly situated to Plaintiff."). We reach the same conclusion with respect to the district court's in-limine analysis of the other six engineers, as this issue clearly relates to whether Louzon satisfied his burden at the prima facie stage. Ford's attempt to refine its argument to include these engineers does not render it appropriate for in-limine consideration.

---

[5]Moreover, we are persuaded that there was no error in the district court's initial summary-judgment order. Zaid Amro is a Jordanian citizen who worked as a Product Design engineer at Ford on an H1 visa. R. 67-8 (Profitt-Brown Decl. at ¶ 3) (Page ID #1620). "Amro commenced an extended vacation on December 9, 2006. He traveled to Jordan to visit his family and was scheduled to be back to work on January 15, 2007." *Id.* Amro was unable to leave Jordan in order to return on his expected return date due to "a delay with the security clearance for his entry visa to return to the United States." *Id.* Amro contacted the manager of Electrical Distribution Systems, the department where he worked, prior to his return date, and she "placed Mr. Amro on an unpaid personal leave of absence" when he had exhausted his vacation time. *Id.* Amro returned prior to his final unpaid-leave return date, in March 2007 and was not terminated. *Id.* at ¶ 5 (Page ID #1621). Given the material similarities between Amro and Louzon, Ford's argument that Amro is not comparable in all relevant respects is unpersuasive.

Because the district court improperly considered non-evidentiary matters on a motion in limine and because the district court applied an incorrect legal standard to determine similarly situated comparators, we **REVERSE** the district court's order granting Ford's motion in limine to exclude all evidence of Louzon's comparators and **VACATE** the district court's grant of summary judgment to Ford on Louzon's age and national-origin discrimination claims.

## IV.  MOTIONS TO COMPEL

Louzon appeals the district court's orders denying in part Louzon's September 11, 2009 and February 10, 2010 motions to compel, which sought extensive discovery on employees terminated by Ford, among other things.  Louzon argues that "the District Court abused its discretion by restricting discovery to only the 7 engineers selected by Ford, and then dismissing Louzon's case because none of those 7 engineers who Ford agreed to disclose is similarly situated sufficiently to meet the requirements of the *McDon[n]ell Douglas* analysis."  Appellant Br. at 39.  Ford responds that neither of these orders "was clearly erroneous or contrary to law."  Appellee Br. at 39.

As an initial matter, although Louzon included the partial denials of each motion in his Notice of Appeal, his brief argues only that the district court abused its discretion in denying his request outlined in the September 11, 2009 motion that Ford produce information on product engineers who were involuntarily terminated during the preceding ten years.  Appellant Br. at 5–6, 39; R. 7 (Mot. to Compel at 6) (Page ID #45).  In fact, it does not appear that there is anything to appeal from the February 10, 2010 motion to compel relating to discovery on terminated engineers, as the district court granted Louzon's request that Ford produce "information regarding other engineers in Ford's Engineering Department who had been disciplined for violating the three (3) work rules identified by Ford's after acquired evidence witness."  R. 34 (Mot. to Compel at 9) (Page ID #610); R. 43 (3/11/10 Order at 1) (Page ID #831).  We therefore consider any argument as to the February 10, 2010 motion to be waived and turn to Louzon's argument that the district court abused its discretion in denying in part Louzon's September 11, 2009 motion to compel.

Although the basis upon which the magistrate judge and the district court made their rulings on Louzon's September 11, 2009 motion is unclear from the record,[6] argument presented by Ford during the March 22, 2010 hearing implies these determinations were based on a clearly erroneous statement of law. Specifically, Ford argued before the district court that the magistrate judge was correct in his determination that Louzon was not entitled to discovery on individuals who were not supervised by Bailey: "I believe Judge Magistrate Whalen was absolutely on target when he ruled that engineers who are terminated for performance reasons or misconduct reasons by people who have no connection to Mr. Bailey, Mr. Bailey's department, no connection to the circumstances that led to Plaintiff's termination are not comparable under federal law or state law." R. 80 (Hearing Tr. at 13:12–18) (Page ID #2105); *see also id.* at 14:3–6 ("So the performance termination of some engineer in five departments, you know, over here is simply not going to reflect in any way or be probative of Mr. Bailey's judgment call that he made under the personal leave policy.").

As we discussed in detail above, however, it is not a prerequisite in discrimination cases that a comparator have the same supervisor as the plaintiff. Moreover, *Bobo* makes clear that this principle is not restricted to summary judgment; in fact, we held in *Bobo* that restricting discovery based on this erroneous same-supervisor requirement amounts to "[a]n improper denial of discovery." 665 F.3d at 753. In light of the scant reasons offered by the district court for its denial of Louzon's motion, and because the only discernable characterization of either the magistrate judge or district court's ruling is a clearly erroneous statement of law, we **VACATE** the district court's order denying Louzon's September 11, 2009 motion to compel and **REMAND** for reconsideration of this motion under the correct legal standard in the first

---

[6] Any transcripts of the hearings before the magistrate judge are not on the docket, and the magistrate judge did not detail his reasoning in either of the orders on Louzon's motions to compel. R. 14 (10/27/09 Order at 1) (Page ID #261); R. 43 (3/11/10 Order at 1) (Page ID #831). Moreover, during hearings on both motions, the district court concluded without elaboration that the magistrate judge's orders were not clearly erroneous or contrary to law. R. 71 (7/12/10 Hearing Tr. at 4:23–5:2) (Page ID #2016–17); R. 80 (3/22/10 Hearing Tr. at 16:10–12) (Page ID #2108). The district court's written orders that followed also lacked a further explanation for the rulings. R. 44 (3/25/10 Order at 1) (Page ID #833); R. 59 (7/22/10 Order at 1) (Page ID #1522).

instance by the district court. We **AFFIRM** the district court's denial in part of Louzon's February 10, 2010 motion to compel.

## V.  CONCLUSION

For the reasons stated, we **REVERSE** the district court's in-limine ruling as to evidence of Louzon's comparators, **VACATE** the district court's grant of summary judgment to Ford on Louzon's age and national-origin discrimination claims and the district court's denial in part of Louzon's September 11, 2009 motion to compel, and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the district court's denial in part of Louzon's February 10, 2010 motion to compel.