**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0475n.06

**No. 13-6051**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jul 02, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| TAMRAL GUZMAN, aka Tammy, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| Defendant-Appellant. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| | ) | |

BEFORE: GRIFFIN and DONALD, Circuit Judges; and GRAHAM, District Judge.[*]

GRIFFIN, Circuit Judge.

Defendant Tamral Guzman appeals multiple convictions arising from her operation of an illicit pain management clinic from which thousands of dosage units of controlled substances were illegally prescribed to individuals, most of whom paid cash for their visits. Because we find no merit in Guzman's claims of error, we affirm.

I.

From October 2008 until her arrest in December 2010, Guzman owned and operated Maryville Pain Management, LLC ("MPM"), in Maryville, Tennessee. While in business, MPM generated more than $2.1 million in receipts. Guzman, a high-school dropout with a GED, had no formal medical training, no license to practice medicine, and no DEA license to issue

---

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

prescriptions. Before opening MPM, she served as the manager of several restaurants and spent approximately two years working at pain clinics in Broward County, Florida.

MPM was originally located on East Broadway Street in Maryville. The business grew rapidly, publicized by word-of-mouth and paper flyers. Because Guzman lacked medical training and could not legally prescribe drugs, she recruited and hired a succession of nurse practitioners and doctors by placing advertisements on Craigslist and sending faxes to medical practices. From its start, MPM bore all of the hallmarks of an illegal operation, quickly attracting the attention of surrounding businesses because of the customer traffic it generated and the drug deals that were witnessed in MPM's parking lot.

When MPM eventually moved into a medical office park on Parliament Drive in order to accommodate the increasing number of customers, its clientele began causing problems for the neighboring medical professionals. A pediatric dentist testified that people lingered in vehicles in the shared parking lot and that some of the "folks that were in the cars out there were [not] in a fully conscious state." Another witness testified to seeing—and conducting—drug deals in the MPM parking lot, noting that some people waited in their cars for other customers whose appointments they had sponsored. An oral surgeon in an adjacent office characterized the atmosphere as an unruly "tailgate party," with belligerent and unkempt individuals loitering and demanding to use nearby bathroom facilities when those at MPM were occupied. The surgeon reported seeing vehicles from "pretty much every county in Tennessee . . . [and] from Florida, Georgia, North and South Carolina, from Kentucky." The situation eventually deteriorated to the point that the dentist and oral surgeon deemed it necessary to lock their office doors during business hours; they testified that they also lost patients and patient referrals because of the

dubious activities at MPM. Law enforcement received numerous complaints, and one police officer testified that pill use "skyrocketed" in Blount County and the number of thefts increased.

The day-to-day internal operations of MPM likewise indicated that something was amiss. Witnesses testified that MPM's waiting room was very crowded, with some customers even sitting on the floor. MPM originally required cash payments from its customers, but later accepted credit cards. At no point did MPM ever accept or process health insurance. Although Guzman had no medical training or license, she did not hesitate to see customers and issue prescriptions on forms that had been signed in advance by MPM's nurses and doctors. The staff testified that they did not conduct meaningful examinations; rather, the emphasis was on speed—one long-time MPM employee testified that, on average, 150 to 170 customers were seen and received prescriptions at MPM each day. Bank employees testified that Guzman regularly deposited thousands of dollars in cash at a local bank.

After MPM opened, local pharmacists noticed an increase in the number of Schedule II narcotics they were dispensing. Groups of people often entered the pharmacies together, as if a bus just pulled up out front," and they carried prescriptions for the same medication or combinations of medications. Those individuals never presented insurance and always paid cash for the prescriptions. The pharmacists realized that it was not uncommon for MPM customers to pay up to $1,500 cash at once for prescriptions. According to the pharmacists, the MPM customers were generally between the ages of 25 and 40, with no visible indications of pain or other infirmities. Oddly, the MPM customers would request particular forms of drugs, such as tablets imprinted with particular markings, thereby suggesting attempts to obtain medications that would be easier to abuse or redistribute.

In September 2009, Guzman initiated the process of establishing a pharmacy at MPM. Using the DEA license number of a physician who was then employed at MPM, Guzman ordered more than $24,000 worth of controlled substances from Dispensing Solutions, Inc. When MPM's physician and nurse practitioner both resigned in October 2009, Guzman, undeterred, operated MPM without any medical practitioner for approximately two weeks, using pre-signed prescription forms. The nurse practitioner who was hired as a replacement by Guzman immediately became concerned that he had joined an illegitimate pain management clinic, and, at the end of October 2009, he began meeting with the DEA regarding his concerns.

As a result, in December 2010, a federal grand jury returned a sealed indictment against Guzman. One week later, law enforcement agents arrested Guzman and executed a search warrant at MPM, seizing currency, customer files, and other documentary evidence. Ultimately, Guzman was charged in a Third Superseding Indictment with fifty-seven counts: conspiring to distribute and possess with intent to distribute oxycodone, hydrocodone, alprazolam, diazepam, and zolpidem, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C), and (b)(2) (Count One); possession with intent to distribute the above-mentioned drugs in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(2) (Count Two); six counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(ii) (Counts Three through Eight); and forty-nine counts of structuring financial transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2) (Counts Nine through Fifty-Seven).[1]

Over the course of its operations, MPM's gross receipts exceeded $2,164,611. In reviewing the prescription records in sixty files, Internal Revenue Service Special Agent

---

[1]The grand jury also charged MPM nurse-practitioner Maimoune Wright with various offenses; the cases were severed for trial. The charges against Wright were dismissed after she was found dead in her residence in January 2013.

Meredith Louden determined that 97.5 percent of the prescribed drugs were Schedule II narcotics, predominantly oxycodone, and 1.62 percent were Schedule III medications. In conjunction with Guzman's sentencing, Louden reviewed the accounting system of MPM for the period from August 11, 2009, through December 14, 2010. During this 320-day period, 11,333 customers were seen. Based upon prescription records maintained by the State of Tennessee and using the conservative assumption that every customer received a prescription for Schedule II drugs to be taken four times daily for twenty-eight days, Louden estimated that 634,648 dosage units of Schedule II drugs were prescribed. Louden's estimation comported with the drug quantities that individual customers received, based on the evidence presented at Guzman's trial.

Guzman's case proceeded to a jury trial in September 2012. The prosecution presented the testimony of MPM customers, former MPM employees, neighboring medical professionals, local pharmacists, drug enforcement officers, health officials, and bank employees, as well as the expert testimony of a DEA agent who investigated pharmaceutical cases and a physician who specialized in chronic pain management. The defense presented the testimony of Guzman's mother and three former MPM employees. Guzman did not take the witness stand, and she absconded before the last day of trial, causing the district court to issue an arrest warrant and conclude the trial in her absence. The jury convicted Guzman as charged. The prosecution then litigated the forfeiture allegations in the indictment, and the jury agreed that the identified property should be forfeited.

Guzman was apprehended in Florida on October 31, 2012.[2] At her sentencing hearing on April 18, 2013, the district court sentenced Guzman to 258 months of imprisonment. This appeal followed.

II.

Guzman contends that the district court erred in denying her motion in limine, in which she requested that the court "prohibit[] the Government or any of its witnesses from referring to [MPM] as a 'pill mill' or as a 'pain clinic' or any other pejorative reference aimed at the Government's vouching or bolstering a claim of illegality in the operation of the pain management clinic." She argues that the term "pill mill" carries a stereotypical, derogatory connotation and that its use at trial was not only prejudicial and inflammatory—effectively shifting the burden of proof to require her to prove that MPM was a legitimate medical practice—but also constituted inadmissible profile or ultimate issue evidence. Guzman cites *Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997), for the proposition that the district court "abuse[d] its discretion when it allow[ed] a witness to define legal terms, especially terms that carry a considerable amount of legal baggage." *Id*. at 1220.

We review the district court's denial of Guzman's motion in limine for an abuse of discretion.[3] *Louzon v. Ford Motor Co*., 718 F.3d 556, 560 (6th Cir. 2013). "An abuse of

---

[2]Guzman was charged separately with failure to appear in violation of 18 U.S.C. § 3146(a)(1) and pled guilty to that offense. (E.D. Tenn. Case No. 3:12-cr-153). At the sentencing hearing, the district court imposed an 18-month sentence for this crime, to be served consecutive to the 240-month term of imprisonment imposed for the primary offenses.

[3]Guzman argues that we should review the district court's ruling de novo, on the theory that her Sixth Amendment rights were ostensibly violated. *See United States v. Davis*, 577 F.3d 660, 666 (6th Cir. 2009). However, as the government correctly points out, Guzman never alleged a constitutional basis for her motion in limine; rather, she cited Tenn. Code Ann. § 63-1-301 and numerous Federal Rules of Evidence. In any event, we have noted on multiple

discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (citation and internal quotation marks omitted).

Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (citation and internal quotation marks omitted). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.* (citation and internal quotation marks omitted); *see also United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006) ("Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned.") (citation and internal quotation marks omitted).

Here, the district court denied Guzman's motion in limine, ruling that the terms "pill mill" and "pain clinic" as used by the witnesses were relevant and admissible:

---

occasions that the abuse-of-discretion standard is not at odds with de novo review of constitutional questions of law. *See United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006); *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006); *United States v. Johnson*, 440 F.3d 832, 842 (6th Cir. 2006). We further note that Guzman's reliance on Tenn. Code Ann. § 63-1-301 as a basis for her motion is questionable. This statute, which took effect on January 1, 2012, to regulate pain management clinics, was not in place when MPM was shut down in 2010, and the specific provision cited by Guzman simply defines the term "pain management clinic"; it neither addresses nor proscribes the use of any other term to describe the type of business conducted at MPM.

As the Government submits, the phrase "pain clinic" does not necessarily have any negative connotation in its everyday use. And while "pill mill" may have some negative connotation, again, the use of this term is not substantially outweighed by the danger of unfair prejudice, as discussed under Rule 403.

"Pill mill" is a word in common usage used not only in law enforcement terms, but in the media, to describe the activity charged in this indictment and the conduct of which Defendant is accused. Again, the Court finds that any prejudicial effect of using this term is mitigated by the probative value of the Government's witnesses being able to accurately describe their knowledge and experience with the clinic.

Certainly, if the use of the term or terms goes beyond that framework which the Court has just described, then, [defense counsel], you're certainly free to object at trial at that point in time.

Further, the Court would find that "pill mill" and "pill clinic" are words in common usage and finding that the average person could, based on his or her own perception, offer helpful opinion testimony on whether the [MPM] fit the definition of this term.

Therefore, use of the term does not conflict with Rule 701 or 702 as argued by [defendant] in the written motion in limine.

We agree. Guzman fails to explain why the oft-used term "pain clinic" is pejorative in any sense, or why the term "pain management clinic" would be any more favorable. Guzman likewise provides no authority for her argument that the phrase "pill mill" is unduly deprecatory and should have been barred from use during her trial. To the contrary, it is a term commonly used by the courts, including our court, to describe illicit pain management clinics. *See United States v. Sadler*, 750 F.3d 585, 595 (6th Cir. 2014); *United States v. Volkman*, 736 F.3d 1013, 1022 (6th Cir. 2013); *United States v. Leal*, 75 F.3d 219, 221, 223 (6th Cir. 1996), *abrogated on other grounds by United States v. Kennedy*, 107 F. App'x 518, 519–20 (6th Cir. 2004). Those few federal courts that have addressed a specific challenge to the use of the "pill mill" terminology have all concluded that the term "pill mill" does not violate evidentiary rules, reasoning, as did the district court in the present case, that

the fact that a term has a negative connotation does not mean that it violates Rule 403. . . . The term "pill mill" is not a legal conclusion . . . but is a phrase used in law enforcement and in the media to describe the activity that has been attributed to [the defendant]. Moreover, the term "pill mill" is merely a shorthand way of characterizing the nature of the allegedly illegal operation. Further, any prejudicial effect by the use of this term at trial is mitigated by the probative value of having witnesses that are able to accurately describe the activity of the instant defendants based on any investigation or personal experience as patients.

*United States v. Kincaid*, No. 3:10-CR-160, 2013 WL 5595404, at *3 (E.D. Tenn. Oct. 11, 2013) (citations omitted). *See also United States v. Stapleton*, No. 12-11-ART-(1), (2), (4), 2013 WL 5966122, at *10 (E.D. Ky. Nov. 8, 2013) ("While the term 'pill mill' certainly carries a negative connotation, its risk of unfair prejudice is small. . . . Compared to similar drug-related terms, 'pill mill' is not especially inflammatory."); *United States v. Caroni*, No. 3:10cr101/MCR, 2011 WL 4102343, at *4 (N.D. Fla. Sept. 13, 2011) ("[T]he phrase 'pill mill' is not a legal term and, instead, is commonly used by laypeople to describe certain types of pain management clinics. . . . Lay witnesses are allowed to offer opinions based on their personal perceptions [under Fed. R. Evid. 701]. And the court finds nothing inappropriate or unduly prejudicial about the phrase 'pill mill.'"); *United States v. Hazelwood*, No. 1:10 CR 150, 2011 WL 2565294, at *24 (N.D. Ohio June 27, 2011) ("The use of the phrase 'pill mill' is not much different than other words like 'drug organization,' 'drug house,' or 'stash house.' They seek to characterize the nature of the allegedly illegal operation.").

We concur that "the phrase 'pill mill' does not meet Rule 403's high bar for exclusion." *Stapleton*, 2013 WL 5966122, at *11. Moreover, although Guzman contends that the government conflated the question of her guilt with the question whether MPM was a "pill mill," the ultimate issue before the jury was not the overall legitimacy of MPM's operation, but whether Guzman was using it in a manner that violated federal law, i.e., by conspiring to

distribute controlled substances unlawfully. For these reasons, the district court did not abuse its discretion in denying Guzman's motion in limine.

III.

Next, Guzman argues that fifty-five of the fifty-seven counts of the third superseding indictment failed to charge cognizable federal offenses and that some of the money-laundering and structuring counts are multiplicitous and thus violate the Double Jeopardy Clause.

As a preliminary matter, the government contends that because Guzman did not challenge the sufficiency of the indictment in the district court, she has waived these claims pursuant to Fed. R. Crim. P. 12(b)(3), which requires that a motion "alleging a defect in the indictment" must be raised before trial. The failure to comply constitutes waiver under Fed. R. Crim. P. 12(e) unless the defendant demonstrates good cause to excuse the waiver. *United States v. Coss*, 677 F.3d 278, 283 (6th Cir. 2012). The narrow exception to this rule is that an allegation that the indictment "fails to invoke the court's jurisdiction or to state an offense" may always be reviewed, so long as the case remains pending. Fed. R. Crim. P. 12(b)(3); *Coss*, 677 F.3d at 283. In addition, a defendant who fails to object to the multiplicitous nature of an indictment prior to trial waives his challenge as to technical errors in the indictment, but not as to errors affecting his substantive rights, such as multiple sentences in violation of the Double Jeopardy Clause. *United States v. Abboud*, 438 F.3d 554, 566–67 (6th Cir. 2006); *see also United States v. Wallace*, 597 F.3d 794, 798 (6th Cir. 2010).

Here, even if we generously assume that the nature of Guzman's claims qualifies for Rule 12(b)(3)'s waiver exception, relief is nonetheless unattainable under the stringent plain error standard of review. *United State v. Teh*, 535 F.3d 511, 516 (6th Cir. 2008). "To meet the plain error test, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.*

(internal quotation marks and citation omitted). Regarding the latter requirement, Guzman must demonstrate that any error in the indictment affected the outcome of the case. *Id*. Moreover, "the indictment must be construed liberally in favor of its sufficiency." *Id.* Applying these standards to Guzman's numerous arguments attacking the sufficiency of the indictment, she has failed to argue, let alone show, that she has satisfied any of the prongs of the plain-error test. For the persuasive reasons advanced by the government, Guzman's challenges to the indictment fall far short of warranting reversal of her convictions.

IV.

Guzman also asserts that the evidence adduced at trial was insufficient to sustain her convictions for Counts One and Two. Regarding Count One, she argues that the government did not present adequate proof as to the agreement or object of the alleged drug conspiracy; and, as to Count Two, she maintains that the essential elements of knowledge, possession of controlled substances, and intent to distribute are inadequately supported by the evidence. We disagree.

We review de novo Guzman's sufficiency-of-the-evidence claim. *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). Viewing the evidence in the light most favorable to the prosecution, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 430–31. In doing so, we neither judge the credibility of the witnesses who testified at the trial nor independently weigh the evidence. *Id.* at 431. "[T]he defendant bears a heavy burden when making a sufficiency of the evidence challenge." *Id*. (citation and internal quotation marks omitted).

In order to prove a conspiracy under 21 U.S.C. § 846, as alleged in Count One of the indictment, the government must prove beyond a reasonable doubt "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the

conspiracy." *Pritchett*, 749 F.3d at 431 (citation and internal quotation marks omitted). The agreement need not be express or formal; rather, "[a] tacit or mutual understanding among the parties is sufficient." *Id*. (citation and internal quotation marks omitted). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan," and once it is shown, only "slight" evidence linking the individual defendant to that conspiracy is required. *Id.* (citation omitted). "[A] buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy, for mere sales do not prove the existence of agreement that must exist for there to be a conspiracy, but evidence of repeated purchases from a single source and large volumes of narcotics creates an inference of conspiracy." *Id*. (citation and internal quotation marks omitted).

As for the offense of possession with intent to distribute a controlled substance (Count Two), 21 U.S.C. § 841(a)(1), the elements are straightforward: "(1) the defendant knowingly, (2) possessed a controlled substance, (3) with intent to distribute." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006).

Contrary to her assertion, the evidence presented by the government at Guzman's trial amply established her guilt on Counts One and Two. Evidence concerning the methods by which Guzman operated MPM demonstrated an agreement between her and co-defendant Maimoune Wright to illegally distribute controlled substances. The testimony at trial showed that, although Guzman had no medical training or license to practice medicine, she and Wright met with customers on an expedited basis and issued thousands of prescriptions for narcotics, with Guzman using prescription forms that Wright had pre-signed in advance. In fact, Wright would sign entire pads of prescription forms at a time for Guzman, and Guzman would simply ask Wright for more when she had exhausted her supply. Wright was typically in the office for

an average of two hours each day and often was not present for the examinations. Instead, Guzman met with the patients and wrote orders for controlled substances and other prescription drugs on the blank pre-signed prescription forms. Guzman would increase the dosage unit or prescribe different drugs than Wright recommended in the patient charts.

The existence of an agreement to violate the drug laws was also evident from the manner in which Guzman and Wright attempted to direct the activities of MPM's staff. According to the testimony of one former MPM physician, they asked him to pre-sign prescription forms for Guzman; however, being uncomfortable with the request, he declined (and ultimately left MPM's employ). Guzman and Wright rejected the physician's suggestion that customers should be required to produce referrals from other medical professionals.

The government also produced evidence showing that Guzman and Wright tried to modify the prescribing practices of another nurse practitioner, who worked at MPM for only two days before her concerns about MPM's legitimacy caused her to quit. The nurse testified that on her second day, at a lunch meeting called by Guzman, Wright told the nurse to prescribe short-acting rather than long-acting medications and to prescribe prednisone for all customers. Certainly, from this evidence, the jury could reasonably infer the requisite agreement to distribute controlled substances, as well as knowledge and participation.

The evidence presented by the government was likewise sufficient to sustain Count Two, possession with intent to distribute controlled substances. In anticipation of establishing a dispensing pharmacy at MPM, Guzman and Wright used an MPM physician's DEA number to order and receive scheduled narcotics. The drugs were kept in a safe at the clinic, and neither the doctor nor Wright knew the combination. The doctor testified that he was not even aware of when the narcotics came into the clinic. Proper and mandatory record-keeping of the narcotics

was not kept, and when the doctor and Wright permanently left MPM, Guzman had no legal authority to keep the narcotics. Yet the evidence established that Guzman continued her exclusive possession and distribution of the narcotics, rather than notifying the DEA or destroying the controlled substances as required by law. Consequently, Guzman's argument that the evidence was insufficient as to Count II is belied by the evidence introduced at the trial.

V.

Guzman further argues that the district court erred in denying her motion for a new trial based on alleged *Brady* violations by the government. We review the district court's denial of a motion for a new trial based on *Brady* violations for an abuse of discretion; however, the district court's ruling as to the existence of a *Brady* violation is reviewed de novo. *United States v. Smith*, 749 F.3d 465, 489 (6th Cir. 2014).

"'[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Id.* (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). A defendant bears the burden of showing that "the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *Id.* (citation and internal quotation marks omitted). "But there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information . . . or if the information was available to him from another source." *Id.* (citation and internal quotation marks omitted). Furthermore, "reversal is warranted only when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation and internal quotation marks omitted).

Here, Guzman did not file her motion for a judgment of acquittal or in the alternative motion for a new trial until the night before her sentencing hearing in April 2013. In it, Guzman alleged, *inter alia*, that the government may have withheld potentially exculpatory evidence in violation of *Brady*. The district court denied the motion as untimely under Federal Rules of Criminal Procedure 29(c)(1) and 33(b)(2) (both establishing a filing deadline of fourteen days after a guilty verdict) and noted that Guzman had not identified any newly discovered evidence that otherwise would permit a new trial under Fed. R. Crim. P. 33(b)(1). Because Guzman's motion was indisputably untimely (the verdict having been rendered in October 2012), her conviction will be upheld unless doing so would result in a manifest miscarriage of justice. *United States v. Myint*, 455 F. App'x 596, 601 (6th Cir. 2012) (citing *United States v. Price*, 134 F.3d 340, 349 (6th Cir. 1998)).

Guzman's *Brady* argument has two prongs. First, she argues that she has reason to believe that the government failed to disclose documents prepared by DEA Diversion Investigator David Graham. Graham assisted MPM in an administrative capacity with advice on regulatory compliance when Guzman first opened the clinic. Guzman surmises that in light of his advisory role, it is likely that Graham maintained documents and notes of his outings, inspections, visits, and interactions with registrants and MPM staff. Guzman argues that these reports Graham made during his early trips to the clinic, and the documentation of his conversations and inspections, would most likely negate her culpability, but because no such documents were disclosed to her by the government during discovery, *Brady* was violated.

However, Guzman's allegations are based on mere speculation and conjecture—simply "not enough" to demonstrate a *Brady* violation. *United States v. Ashley*, 274 F. App'x 693, 696–97 (6th Cir. 2008) (citing *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996),

and *United States v. Santiago*, 993 F.2d 504, 506 (5th Cir. 1993)).   Guzman had ample opportunity to inquire whether other documents existed when Graham testified at trial and was subject to cross-examination.   In fact, the government elicited testimony on direct examination that Guzman called Graham's office when MPM first opened, spoke with Graham, and asked him to meet with her to discuss compliance issues.   This testimony undermines Guzman's assumption that the government was concealing or withholding information about her interactions with Graham.   Guzman has absolutely nothing to suggest the existence of exculpatory evidence.

In the second prong of her *Brady* claim, Guzman contends that she was denied access to certain currency transaction reports ("CTRs") filed in conjunction with her bank deposits of funds in amounts over $10,000.   She asserts that these reports would provide her with impeachment evidence, because individuals other than herself made MPM deposits at the bank, and the CTRs and information contained therein would therefore negate her criminal intent. Apparently, she also believes that the CTRs would militate against a finding that she was attempting to avoid the reporting of deposits.   However, Guzman has not shown that such documentation would have been relevant, let alone exculpatory.   Opportunities to access or request this information were presented during the trial, when prosecution witnesses testified that CTRs were filed for certain transactions.   Moreover, Guzman received copies of all of the bank statements used by the government to support the money laundering and structuring costs, again opening the door for her to review the transactions for exculpatory evidence.   She did not avail herself of this opportunity.

In short, Guzman has not identified a *Brady* violation or resultant miscarriage of justice. Therefore, the district court did not abuse its discretion in denying her motion for a new trial or judgment of acquittal.

## VI.

Finally, despite Guzman's assertions that the proofs adduced at trial and the jury instructions effected a constructive amendment or prejudicial variance to her indictment for Counts One and Two, our review of the record indicates that no such error transpired, and Guzman has not made the heightened demonstration of plain error that applies to this issue, which was not preserved by objection in the district court. *See generally United States v. Smith*, 749 F.3d 465, 481 (6th Cir. 2014).

## VII.

For the foregoing reasons, we affirm the judgment of the district court.