RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAVID PITTINGTON,

          *Plaintiff-Appellant,*

*v.*

GREAT SMOKY MOUNTAIN LUMBERJACK FEUD, LLC,

          *Defendant-Appellee.*

No. 17-5590

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:14-cv-00397—Pamela Lynn Reeves, District Judge.

Argued: December 1, 2017

Decided and Filed: January 24, 2018

Before: DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Jesse D. Nelson, NELSON LAW GROUP, PLLC, Knoxville, Tennessee, for Appellant. Al Holifield, HOLIFIELD JANICH RACHAL & ASSOCIATES, PLLC, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Jesse D. Nelson, NELSON LAW GROUP, PLLC, Knoxville, Tennessee, for Appellant. Al Holifield, HOLIFIELD JANICH RACHAL & ASSOCIATES, PLLC, Knoxville, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court in which DAUGHTREY, J., joined. SUTTON, J. (pp. 21–26), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Plaintiffs who successfully prove that they were fired in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") are presumptively entitled to back pay for the amount they would have earned had they not been unlawfully terminated.  Such awards are intended to compensate fully plaintiffs for the wrongs that they suffered.  For the same reason, an award of prejudgment interest on the back pay owed is also nearly always appropriate.  We conclude from these principles that a district court must grant a motion for a new trial as to damages when a jury awards back pay to a Title VII plaintiff in an amount that is substantially less than the damages to which he is indisputably entitled.  Once damages are calibrated correctly, the district court should also make an effort to align its award of prejudgment interest (if such interest is requested and warranted) with Title VII's remedial goals.  Because the district court failed to take those steps here, we **REVERSE** and **REMAND** for further proceedings consistent with our opinion.

**I. BACKGROUND**

David Pittington ("Pittington") worked for Great Smoky Mountain Lumberjack Feud, LLC, ("Lumberjack"), a theater company in Pigeon Forge, Tennessee, for five months in 2012 until he was fired in retaliation for supporting his wife (who was also a Lumberjack employee) in her sexual harassment complaint against Lumberjack.  *See* R. 74 (Trial Tr. at 2–3, 15, 43) (Page ID #2534–35, 2547, 2575).  Before being fired, Pittington allegedly suffered a number of additional hardships:  he was demoted and his duties were diminished; his hours were reduced; he was segregated from his coworkers and made to work in an unheated, outdoor shack; and while in the shack, he was denied access to a padded chair that Lumberjack had previously provided, and which he needed because of a pre-existing medical condition that caused his leg to swell, his back to knot, and his mobility to be impaired if he stood for long periods of time.  *See* R. 1-1 (Am. Compl. ¶¶ 11–16, 20, 24, 28) (Page ID #18–22); R. 74 (Trial Tr. at 11, 29–32) (Page ID #2543, 2561–64).  Following his termination, Pittington sued Lumberjack in state court, alleging that Lumberjack took adverse actions against him because of his disability, in

violation of the Americans with Disabilities Act ("ADA"), and because of his involvement in his wife's sexual harassment complaint, in violation of Title VII and the Tennessee Human Rights Act. R. 1-1 (Am. Compl. ¶¶ 17–29) (Page ID #20–22). Lumberjack removed the case to federal court, R. 1 (Notice of Removal) (Page ID #1–2), and the parties ultimately proceeded to trial before a jury.

At trial, Pittington presented the following evidence of his earnings during and after his employment at Lumberjack:

1.  Pittington testified that he began working for Lumberjack in June 2012 as a box office clerk. R. 74 (Trial Tr. at 8, 47–48) (Page ID #2540, 2579–80). When asked to approximate his starting salary at Lumberjack, Pittington testified that he earned "[m]aybe $8 an hour" to start. *Id.* at 8 (Page ID #2540).

2.  Pittington recalled receiving two promotions while working at Lumberjack. Soon after he joined Lumberjack, he was promoted from "box office clerk" to "a.m. lead." *Id.* at 11 (Page ID #2543). He was then promoted again from "lead" to "assistant box office manager." *Id.* at 12 (Page ID #2544).

3.  On cross-examination, Lumberjack's counsel inquired into Pittington's pay raises while at Lumberjack. Lumberjack's counsel asked, "[Y]our testimony is, I think, you received two promotions, but did you not go from $8 to $10.50 [per hour] once you went to a lead, and there w[ere] no other pay raises?" *Id.* at 48–49 (Page ID #2580–81). Pittington responded that he would "have to see the paper" because he did not "recall off the top of [his] head." *Id.* at 49 (Page ID #2581). He later testified that, "[o]ff the top of [his] head," he remembered receiving only one pay raise. *Id.* at 51 (Page ID #2583).

4.  Pittington testified that he typically worked eight hours per day for a total of forty hours per week while working at Lumberjack. *Id.* at 8, 57 (Page ID #2540, 2589). Lumberjack admitted Pittington's time cards for his "entire time of employment" into evidence. *Id.* at 93 (Page ID #2625). Lumberjack's counsel walked Pittington through his time cards on September 28,[1] October 1, October 2, and October 8, 2012. *Id.* at 58–59 (Page ID #2590–91). Pittington agreed that his time cards for September 28, October 1, and October 2 show that he worked more than eight hours on three of those four days. *Id.*

---

[1]Lumberjack's attorney referred to the time cards for "October 28, October 1, October 2, and October 8," but since Pittington's employment was terminated on October 8, we assume that Lumberjack's attorney was actually referring to Pittington's time card for September 28 rather than October 28. In any event, the correct date of this time card is not critical to the resolution of this case.

5. After being fired from Lumberjack on October 8, 2012, Pittington testified that he did not gain new employment until April 2013. *Id.* at 2–3, 59 (Page ID #2534–35, 2591). He testified that he "look[ed] for work during that time." *Id.* at 3 (Page ID #2535).

6. Pittington testified that he was hired in April 2013 by Perry Smith Development. *Id.* Pittington worked in the corporate office for Perry Smith Development handling guest relations. *Id.* His pay at Perry Smith Development started at $7.25 per hour. *Id.* He was laid off by Perry Smith Development after a corporate reorganization. *Id.* at 4 (Page ID #2536). He was laid off "maybe [in] the end of August, beginning of September." *Id.* at 3 (Page ID #2535).

7. Pittington testified that his next job was with the Cyrus Family Theater. *Id.* at 4 (Page ID #2536). That position began in "either May or June" of 2014. *Id.* He was supposed to receive $500 a week while working there, but his employer "wrote bad checks or just didn't write a check at all during that time." *Id.* at 4–5 (Page ID #2536–37). He worked there until October 2014 and received "[m]aybe one or two checks" during that time. *Id.* at 5 (Page ID #2537).

8. Pittington testified that he was next employed by Sablé Equestrian Theater in January 2015. *Id.* at 5 (Page ID #2537). He received $500 or $600 per week while there. *Id.* at 6 (Page ID #2538). He worked at Sablé Equestrian Theater until it went of business in September 2015. *Id.*

9. Pittington testified that he was next employed by the Clarion Inn, a hotel. *Id.* at 6 (Page ID #2538). In its jury instructions, the district court informed the jury that "[t]he parties stipulate that Mr. Pittington fully mitigated his damages as of October 12, 2015," when he secured employment at the Clarion Inn, and therefore "any damages awarded in the form of back pay should not go beyond October 12, 2015, . . . . as this is the date that Mr. Pittington obtained a new job of like kind, status, and pay." *Pittington*, 2017 WL 1393718, at *2.

10. Pittington's counsel asked Pittington whether it is "hard to keep a good job at a theater in Pigeon Forge." R. 74 (Trial Tr. at 6) (Page ID #2538). Pittington responded: "I wouldn't say it's hard to keep a good job. There's a lot of theaters in town. I'm not sure if it's exactly hard to keep a job. There's a lot of theaters that have—some theaters have employees that have been there quite some time." *Id.* at 6–7 (Page ID #2538–39). He then clarified that it was "common in Pigeon Forge" for theaters to "fold[]." *Id.* at 7 (Page ID #2539).

During his closing remarks, Pittington's attorney urged the jury to award Pittington $40,632.50 in back pay. R. 91 (Trial Tr. at 15) (Page ID #2984). Counsel reached this number by assuming that Pittington would have received $10.50 per hour and worked an average of forty hours per week had he remained employed by Lumberjack. *Id.* at 14 (Page ID #2983). He stated

that Pittington remained unemployed following his termination from Lumberjack for twenty-eight weeks, and thus was owed $11,760 for that time. *Id.* Pittington then worked for twenty-one weeks beginning in April 2013, but he did not earn as much at Perry Smith Development as he had at Lumberjack, and thus was, according to his counsel, entitled to $4,252.50 in deficiency wages. *Id.* He was then unemployed again for thirty-five weeks, which counsel calculated as $14,700 in lost wages. *Id.* at 14–15 (Page ID #2983–84). Pittington then worked at Cyrus Family Theater from June 2014 to October 2014, but received only two paychecks of $500 each during that time, and therefore counsel argued that Pittington was owed $8,240 in in back pay for those twenty-two weeks. *Id.* at 15 (Page ID #2984). Pittington was unemployed again for three weeks, and then worked at Sablé Equestrian Theater from January 2015 through September 2015. *Id.* Because Pittington was "making more [money] at a similar job," Pittington's attorney conceded that Pittington was not owed any damages for that period. *Id.* Finally, Pittington was unemployed for another four weeks (after Sablé closed down and before beginning his work at Clarion Inn), and was thereby owed $1,680 in back pay for that period, according to his attorney. *Id.* All told, the above figures added up to $40,632.50. *See id.* at 14–15 (Page ID #2983–84).

For his part, Lumberjack's attorney in closing urged the jury to find that Pittington had failed to mitigate adequately his damages and therefore was not entitled to the full amount of back pay that he requested. In particular, Lumberjack's counsel stated:

> They talked about the money damages. I hope we don't get to this part of the case; but if we do, the plaintiff has a duty to mitigate. And one thing that stuck out as the plaintiff was talking about damages, did you hear the time period of 35 weeks unemployed? Pigeon Forge? That's a long time to not get a job in Pigeon Forge. Fifty-two weeks in a year. That means only 17 weeks employed that year. There's a duty to mitigate. There's a duty to get a job. So do you have to award all the back pay they're seeking? No.

R. 95 (Trial Tr. at 15) (Page ID #3062).

After deliberations, the jury returned a verdict in Pittington's favor on his Title VII and Tennessee Human Rights Act retaliation claims.[2] R. 72 (Judgment) (Page ID #1545). Though

---

[2]At the close of Lumberjack's case, the district court entered a directed verdict in favor of Lumberjack on Pittington's ADA claim. *See* Appellee Br. at 3 n.1; R. 66 (Minute Entry for Jury Trial, Day 3) (Page ID #1531). Pittington did not appeal this order.

the jury declined to award Pittington any compensatory or punitive damages, it awarded Pittington $10,000 in back pay.  R. 72 (Judgment) (Page ID #1545).  This figure puzzled Pittington, as he believed that his uncontroverted testimony at trial established that he was owed more than $40,000 in back pay.  He therefore filed a motion urging the district court to increase the jury's damages award under Federal Rule of Civil Procedure 59(e)[3] or else hold a new trial as to damages under Federal Rule of Civil Procedure 59(a).[4]  R. 77 (Mem. in Support of Pl.'s Motion to Alter/Amend Judgment at 3–5) (Page ID #2669–71).  He also asked the district court to award him front pay and prejudgment interest on his back pay award at a rate of 10%, which is the maximum amount allowed under Tennessee law for violations of the Tennessee Human Rights Act.  *Id.* at 6–9 (Page ID #2672–75); *see also* Tenn. Code Ann. § 47-14-123.

The district court declined to award front pay, increase Pittington's back pay award, or hold a new trial as to damages, but it agreed that prejudgment interest on the back pay award was warranted.  *See Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, No. 3:14-CV-00397, 2017 WL 1393718, at *2–4 (E.D. Tenn. Apr. 18, 2017).  Concluding that the 10% interest rate that Pittington had requested would afford him an undue windfall, the district court opted instead to award compound prejudgment interest at the rate set forth in 28 U.S.C. § 1961(a), which governs the postjudgment interest rate in federal cases.  *Id.* at 3.  At the time of judgment in this case, § 1961(a) called for an interest rate of 0.66%.  *See* Appellant Br. at 8 & n.1.

On appeal, Pittington challenges the district court's refusal to increase the jury's damage award or otherwise hold a new trial as to damages, along with the district court's decision to award prejudgment interest in accordance with the rate set by 28 U.S.C. § 1961(a).  *See* Appellant Br. at 6–9.  Pittington does not appeal the district court's denial of his request for front pay.

---

[3]Rule 59(e) of the Federal Rules of Civil Procedure permits parties to file "[a] motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).

[4]With respect to jury trials, Rule 59(a) authorizes district courts, on motion, to grant a new trial as to some or all issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

## II.  DISCUSSION

### A.  Standard of Review

We review for abuse of discretion a district court's denial of a motion for a new trial under Rule 59(a), denial of a motion to alter or amend a judgment under Rule 59(e), and award of prejudgment interest.  *See Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007) (discussing Rule 59(e)); *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir. 2000) (discussing award of prejudgment interest); *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996) (citing *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 171 (6th Cir. 1993)) (discussing Rule 59(a)).  "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment."  *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) (quoting *Miller v. Countrywide Bank, N.A.*, 708 F.3d 704, 707 (6th Cir. 2013)).  We review de novo any legal conclusions the district court reached in the course of assessing a motion under Rule 59.  *Nat'l Ecological Found.*, 496 F.3d at 476.

### B.  Denial of Motion to Order a New Trial as to Damages Under Rule 59(a)

In reviewing the district court's denial of Pittington's motion for a new trial as to damages, three key principles guide our analysis.  First, successful Title VII plaintiffs are presumptively entitled to back pay, and they ought to receive enough back pay to make them whole—"that is, to place [them] in the position [they] would have been in but for discrimination."  *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983).  It is thus an abuse of discretion to set a back pay award that falls far short of this restorative goal, *see United States v. City of Warren*, 138 F.3d 1083, 1097 (6th Cir. 1998), but it is also an abuse of discretion to disturb a jury's back pay award that adequately approximates the amount the Title VII plaintiff was unlawfully denied, *see Anchor*, 94 F.3d at 1021.  Put differently, a jury award of back pay ought to stand unless "the evidence indicates that the jury awarded damages in an amount substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence.  Thus, if the verdict is supported by some competent,

credible evidence, a trial court will be deemed not to have abused its discretion in denying [a] motion" for a new trial as to damages. *Id.*

Second, the Title VII plaintiff bears the burden of proving damages with "reasonable certainty," *see Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983) (citing *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 314–16 (6th Cir. 1975)), but "back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case," *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) (quoting *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991)). "Backpay should be awarded even where the precise amount of the award cannot be determined. Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." *Rasimas*, 714 F.2d at 628 (citations omitted). Generally, back pay is calculated by subtracting "the amount that the plaintiff actually earned while being discriminated against [from] the amount that the plaintiff would have earned if no discrimination had occurred." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir.), *cert. denied*, 137 S. Ct. 198 (2016)).

Finally, Title VII requires plaintiffs to mitigate damages. *Rasimas*, 714 F.2d at 623 (citing 42 U.S.C. § 2000e-5(g)). This rule is designed "to prevent claimants from recovering for damages which they could have avoided through reasonable diligence." *Id.* (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 (1982)). To that end, courts must deduct any "[i]nterim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against" from the plaintiff's back pay award. *Id.* (quoting 42 U.S.C. § 2000e-5(g). Though the plaintiff bears the initial burden of "establish[ing] a prima facie case and present[ing] evidence on the issue of damages," the defendant bears the subsequent burden of "establish[ing] the amount of interim earnings or lack of diligence." *Id.* (citations omitted). "The [d]efendant may satisfy his burden *only* if he establishes that: 1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions." *Id.* at 624 (citing *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980)) (emphasis added). In other words, the plaintiff is "'entitled to the amount claimed unless the defendant can prove'

otherwise."  *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 841 (6th Cir. 1994) (quoting *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 547 (6th Cir. 1989)).

In light of the above principles, the district court abused its discretion in this case when it refused to hold a new trial on the issue of damages.  The district court interpreted the jury's damages award of $10,000 as approximating the compensation Pittington "would have earned from the time he was terminated in October 2012, until he obtained employment in April 2013." *Pittington*, 2017 WL 1393718, at *2.  Given this interpretation, the district court necessarily understood the jury to have credited Pittington's testimony regarding his compensation at Lumberjack—namely, that he earned between $8 and $10.50 per hour during his time at Lumberjack and worked an average of 40 hours of week, and therefore would have earned somewhere between $8,000 and $10,500 in the 25 weeks between October 8, 2012 and April 1, 2013.  Nevertheless, the district court determined that the jury was justified in declining to award damages to Pittington for the remaining periods of unemployment or underemployment that he experienced between August/September 2013 and October 2015 because Pittington had "failed to provide the jury with necessary information needed to determine his damages or to establish his damages with 'reasonable certainty'" as to those times.  *Id.*  In particular, the district court faulted Pittington for failing (1) to "provide specific testimony regarding the periods of time he was unemployed or his efforts to find employment during those periods other than to state that he 'looked for work'"; (2) to submit "documentation to substantiate his testimony as to his employment or the amounts he earned while employed"; and (3) "to provide any documentation to support the calculation of his claim for back pay."  *Id.*  Such critiques were unfounded, as Pittington did not bear the burden of producing evidence as to his efforts at mitigation.

As noted above, plaintiffs in Title VII cases have a duty to mitigate damages, but "'the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence' in mitigating damages" rests with the defendant.  *Wooldridge*, 875 F.2d at 548 (quoting *Rasimas*, 714 F.2d at 623).  We have previously rebuked district courts for "appl[ying] incorrect legal principles in apparently requiring the employees to prove their efforts to mitigate their damages."  *Id.*  Indeed, we have been quite clear that "[a] claimant is not required to submit evidence of diligence and reasonable care in seeking employment until [the] defendant has met

its burden." *Id.* (citing *Sprogis v. United Air Lines Inc.*, 517 F.2d 387, 392 (7th Cir. 1975)). Thus, where, as here, a defendant has offered no evidence indicating that "substantially equivalent positions . . . were available" and that "the claimant failed to use reasonable care and diligence in seeking such positions," *Rasimas*, 714 F.2d at 624 (citations omitted), a plaintiff has no legal obligation to demonstrate that he sought or obtained comparable employment after his unlawful termination. The district court's holding that "it [was] up to the jury to decide whether plaintiff attempted to mitigate his damages," *Pittington*, 2017 WL 1393718, at *2, is therefore legally incorrect insofar as the district court believed that the jury's findings could be based on Pittington's failure to prove mitigation, as opposed to Lumberjack's proof that Pittington's mitigation efforts were unreasonable in light of the employment opportunities available to him.

Lumberjack contends that the district court did not improperly shift the burden onto Pittington to prove mitigation, but instead properly upheld the damages verdict because the jury had "infer[red] a lack of mitigation." Appellee Br. at 23. Once again, such an argument is legally tenable only if a reasonable jury could find that Lumberjack proved by a preponderance of the evidence that "substantially equivalent positions" were available to Pittington and that Pittington had "failed to use reasonable care and diligence in seeking such positions." *Rasimas*, 714 F.2d at 624. But Lumberjack provided no evidence regarding the availability of comparable employment in or around Pigeon Forge and made no effort to demonstrate that Pittington's job-search process was unreasonable. *Compare* R. 74 (Trial Tr. at 44–101) (Page ID #2576–2633) (cross-examination of Pittington, in which no mention is made of the Pigeon Forge job market or Pittington's mitigation efforts), *with Ford v. Nicks*, 866 F.2d 865, 874–75 (6th Cir. 1989) (holding that the defendant—a university that had improperly refused to retain the plaintiff as an assistant professor of education—had adequately demonstrated the plaintiff's failure to mitigate by pointing to testimony from witnesses from three other universities that "during the relevant period they had numerous openings for assistant professors of education and that [the plaintiff] would have been qualified for these jobs" and showing that the plaintiff had refused to accept a job offer from another university that was comparable to the position from which she had been unlawfully fired). Rather, Lumberjack argues that such an inference may be grounded in (1) Pittington's statement that he's "not sure if it's exactly hard to keep a job [at a theater in Pigeon Forge]. There's a lot of theaters that have—some theaters have employees that have been

there quite some time," Appellee Br. at 23 (quoting R. 74 (Trial Tr. at 6–7) (Page ID #2538–39); and (2) the jury's purported "common knowledge of the job market in Pigeon Forge as a year-round tourist destination," *id.* This argument is unpersuasive. Theater employees' ability to retain jobs tells the jury next to nothing about unemployed persons' ability to secure jobs, and Lumberjack provided no evidence from which the jury could infer that jobs comparable to Pittington's position at Lumberjack were readily accessible in Pigeon Forge. "[A] jury verdict based on speculation, supposition, or surmise is impermissible." *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 793 (6th Cir. 2005). Thus, to the extent the district court upheld the jury's damages award on the ground that Lumberjack proved Pittington's failure to mitigate by a preponderance of the evidence, such a determination was a clear error of judgment and an abuse of discretion.

Lumberjack alternatively argues that the district court affirmed the jury's $10,000 back pay award based on Pittington's failure to prove damages, for which he bore the burden. In particular, Lumberjack contends that Pittington failed to establish with reasonable certainty either the gross amount of back pay he was owed (i.e., the amount he would have earned between October 2012 and October 2015 had he continued to be employed by Lumberjack) or the amount of wages he earned from the positions he held after being terminated by Lumberjack (i.e., the amount by which his gross damages should be offset). This argument fails on both fronts. First, Pittington testified that his starting salary at Lumberjack was approximately $8 per hour, and he did not disagree with opposing counsel's statement that his salary was subsequently raised to $10.50 per hour.[5] R. 74 (Trial Tr. at 8, 48–49) (Page ID #2540, 2580–81). Pittington

---

[5]Q: Now, when you started at Lumberjack Feud, you began at $8 an hour. Isn't that correct?
A: I believe so.

. . . .

Q: I think—your testimony is, I think, you received two promotions, but did you not go from $8 to $10.50 once you went to a lead, and there was no other pay raises?
A: I'd have to see the paper. I don't recall off the top of my head.

. . . .

Q: [I]s it your testimony that you had—were promoted from clerk to lead? Is that correct?
A: Yes.
Q: And then from lead to assistant box office—assistant box office manager?
A: Yes.
Q: And that there was two distinct pay raises?

further testified that he worked an average of forty hours per week at Lumberjack, and Lumberjack admitted into evidence Pittington's time cards for the "entire time of [his] employment." *Id.* at 8, 59, 92–93 (Page ID #2540, 2591, 2624–25). From this testimony and documentation, the jury could reasonably discern that Pittington would have expected to earn a weekly salary between $320 ($8 multiplied by forty hours) and $420 ($10.50 multiplied by forty hours) had he remained employed at Lumberjack.[6] Such evidence satisfied Pittington's burden of production regarding the gross amount of back pay that he was owed. *See, e.g.*, *Burton v. Zwicker & Assocs.*, 577 F. App'x 555, 563 (6th Cir. 2014) (holding plaintiff's testimony that "he made approximately $46,000 in the first five months of 2010" supported jury award of $300,000 in back pay for the thirty-five months between his termination and the parties' trial because he was "entitled to a maximum of approximately $322,000 in back pay ($46,000 [total earnings] / 5 [months] = $9,200 [average monthly earnings] x 35 [months] = $322,000)"); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994) (upholding jury award of $63,055 for the two years between the date of termination and the date of judgment, which equaled the plaintiff's salary for his last two years of employment before being unlawfully terminated). The district court acknowledged as much, as it interpreted the jury award to constitute the salary Pittington would have received between October 8, 2012 and April 2013, based on Pittington's estimates of his hourly wage and average weekly hours while employed by Lumberjack. *See Pittington*, 2017 WL 1393718, at *2.

Lumberjack's second argument—that Pittington failed to prove sufficiently his interim earnings—is legally untenable. Lumberjack, not Pittington, bore the burden of proving the amount of Pittington's interim earnings between discharge and judgment. *See Rasimas*, 714 F.2d at 623; *see also Burton*, 577 F. App'x at 563 (refusing to modify a jury award that had failed to

---

A:  I don't remember if there was two distinct pay raises. I know that there was a pay raise with the promotion.
Q:  And so the pay raise that you would remember would be the one pay raise. Do you remember two pay raises?
A:  Off the top of my head, I remember one.

R. 74 (Trial Tr. at 48–51) (Page ID #2580–83).

[6]Indeed, we have previously held that where a defendant indicates that the plaintiff worked at a higher hourly rate than the plaintiff asserts, the jury ought to calculate the back pay award using the higher rate proffered by the defendant. *See Tramill v. United Parcel Serv.*, 10 F. App'x 250, 253–55 (6th Cir. 2001).

offset a plaintiff's damages award by any wages that the plaintiff may have earned from other jobs after his termination because the defendant "only established that [the plaintiff] was employed," but "did not present any evidence about [the plaintiff's] interim earnings"). True, we have consistently explained that "back-pay awards should make a plaintiff whole, not better off." *See, e.g.*, *Hance*, 571 F.3d at 521. Thus, where, as here, a plaintiff offers some evidence of his post-termination and pre-mitigation wages, the jury is entitled to take such information into account when determining the amount of back pay needed to make the plaintiff whole. But no reasonable jury could have deduced from Pittington's testimony that he was owed only $10,000 in back pay. Pittington testified as to the approximate start and end dates of his employment between October 2012 and October 2015, along with the reasons each job ended and the approximate salary or hourly wage that he earned in each position. *See* R. 74 (Trial Tr. at 2–7) (Page ID #2534–39). With the possible exception of Pittington's position with Perry Smith Development—where Pittington worked from April 2012 until the end of August or beginning of September 2013 for $7.25 an hour, for an undisclosed number of hours, *id.* at 3–4 (Page ID #2535–36)—the jury could reasonably estimate the amount of earnings Pittington secured from his subsequent employment, *see id.* at 3–7 (Page ID #2535–39) (Pittington earned at most $1,000 while working at Cyrus Family Theater, assuming he received two paychecks during his time there, and a little under $21,000 while working at Sablé Equestrian Theater, assuming an approximate start date of January 1, 2015 and an approximate end date of September 1, 2015 and a weekly wage of $600). Even if the jury declined to award Pittington any deficiency wages in conjunction with his work at Perry Smith Development—a position that would be difficult to square with the requirement that "[a]ny ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer," *Rasimas*, 714 F.2d at 628 (citations omitted)—Pittington nevertheless was entitled to something in the range of $35,000 in damages.[7] And even if the jury used Pittington's starting hourly rate of $8 as the

---

[7]Pittington's gross damages equal $65,940 (10.5 hourly rate x 40 hours per week x 157 weeks between October 8, 2012 and October 12, 2015). From that number, the jury should have subtracted the $1,000 Pittington earned at Cyrus Family Theater and the $21,000 that Pittington earned during the roughly 35 weeks that he worked at Sablé Equestrian Theater. Finally, assuming the jury was entitled to presume that Pittington earned as much as he would have earned but for his unlawful termination during his time at Perry Smith Development, it could have deducted an additional $9,240 from the gross award. All told, the final damages figure would amount to slightly less than $35,000.

basis for its back pay calculation on the theory that Pittington never concretely established that his rate had been raised to $10.50 per hour, he would still be entitled to over $21,000—more than double what the jury actually awarded. It is true, of course, that "[o]nce the existence of damages is shown with reasonable certainty, 'the precise amount is necessarily left to the discretion of the finder of fact, to be exercised reasonably and within the range of the proofs in the case.'" *Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir. 1983) (quoting *Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 366 (6th Cir. 1978)). But an award that amounts to somewhere between 30% and 50% of what Pittington was legally due, based on his uncontroverted testimony, is not "within the range of the proofs in the case." *See id.*[8]

Finally, Lumberjack insists that even if Pittington satisfied his burden of production as to his damages, he may have failed to meet his burden of persuasion, regardless of whether his testimony "stands unrebutted." *See* Appellee Br. at 12. Once again, this argument inverts the proper burden of proof. The jury could not simply disbelieve Pittington's testimony as to his earnings between April 2013 and October 2015 and, on that basis, decide that Pittington was not entitled to any back pay for those thirty months, particularly since the jury apparently found that

---

Pittington's counsel offered a higher estimate in his closing argument at trial by arguing that Pittington should not receive damages for his time working at Sablé Equestrian Theater because his salary there exceeded his salary at Lumberjack. The proper way to calculate damages, however, is to subtract "the amount that the plaintiff actually earned while being discriminated against [from] the amount that the plaintiff would have earned if no discrimination had occurred." *Szeinbach*, 820 F.3d at 821. Thus, the wages Pittington earned while working at Sablé Equestrian Theater should have been deducted from his gross damages calculation, rather than merely zeroed out.

[8]Notably, the dissent agrees that the jury could have reasonably reached a back pay award of approximately $21,000. The dissent, however, believes that the jury could then deduct $11,200 from the back pay award because Pittington purportedly conceded "that it is not hard to get a job in Pigeon Forge" and he "could not explain how, or if, any job search efforts came up short," and therefore the jury could conclude that Pittington had failed to mitigate damages during his thirty-five weeks of unemployment. *See* Dissent Op. at 23. As explained above, Lumberjack—not Pittington—bore the burden of proving failure to mitigate. Pittington had no obligation to offer evidence of his job-search efforts unless and until Lumberjack placed mitigation in issue. *See Jackson*, 31 F.3d at 1359 ("Though the defendants are correct that the jury must consider mitigation of damages when such evidence is presented, the jury has no obligation to create such figures out of thin air. . . . If the defendants wished the jury to find mitigation, they should have presented the jury with evidence to that effect.").

The dissent correctly observes that Lumberjack could have, in theory, relied on Pittington's testimony to meet its burden. But recall what "failure to mitigate" means: Lumberjack had to show that "substantially equivalent positions . . . were available" and that Pittington "failed to use reasonable care and diligence in seeking such positions," *Rasimas*, 714 F.2d at 624. A jury could not reasonably glean, from the sole statement that it was not so hard for long-time theater employees in Pigeon Forge to *keep* their jobs, that it would have been easy for Pittington to *get* a comparable job in Pigeon Forge and that he had been lackadaisical in his efforts to do so.

Pittington had established with "reasonable certainty" the amount he would have earned during that time had he remained employed at Lumberjack.[9] To hold otherwise would authorize a fact finder not merely to disregard testimony it disbelieves, but also to treat such "unbelieved testimony [as] . . . sufficient grounds for drawing the opposite conclusion"—a prospect that we have previously disfavored. *See Duddy v. Kitchen & Bath Distribs., Inc. (In re H.J. Scheirich Co.)*, 982 F.2d 945, 949 (6th Cir. 1993) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)).

This is not to suggest that a jury is precluded from making credibility determinations when assessing damages in a discrimination case. A jury may, for instance, decline to award the plaintiff's full claim for back pay, notwithstanding the plaintiff's "testimony that she had been out of work for one year and one month," where the defendant, "[t]hrough cross-examination, . . . proved that [the plaintiff] failed to use reasonable diligence in seeking employment" during that time. *Voyles v. Louisville Transp. Co.*, 136 F. App'x 836, 838–39 (6th Cir. 2005). But unlike in *Voyles*, the defendant here did not controvert or undermine Pittington's testimony with regard to damages. If anything, Lumberjack introduced evidence that would indicate that Pittington was owed even more in back pay than the amount he claimed. *See* R. 74 (Trial Tr. at 92–93) (Page ID #2624–25) (admitting into evidence Pittington's time cards, which showed that he worked more than eight hours per day during at least part of his employment). Once a plaintiff "prove[s] entitlement to back pay by providing information from which [his] damages can be determined, . . . '[]he is presumed to be entitled to the amount claimed unless the defendant can prove' otherwise." *Wilson Metal Casket Co.*, 24 F.3d at 841 (quoting *Wooldridge*, 875 F.2d at 547).

In short, the district court applied an erroneous legal standard to the extent that it held that the jury could find that Pittington had failed reasonably to mitigate his damages without requiring Lumberjack to prove such unreasonableness by a preponderance of the evidence. If the

---

[9]As the district court noted, the jury's $10,000 award appears to correspond to the amount Pittington would have received between October 2012 and April 2013 (i.e., his initial bout of unemployment after being unlawfully terminated). If the jury credited Pittington's testimony regarding his weekly hours and hourly rate, then it had all the information it needed to calculate the pay Pittington would have received from Lumberjack between April 2013 and October 2015, as well.

district court instead affirmed the jury's damages award on the ground that Pittington had failed to prove his damages from April 2013 through October 2015, such a decision would still amount to an abuse of discretion because no reasonable jury could find that Pittington had failed to make out a prima facie case as to the issue of damages. Because the $10,000 award Pittington received was "substantially less than [even the lowest estimate of damages that had been] *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence," *see Anchor*, 94 F.3d at 1021, the district court erred in declining to order a new trial as to the issue of damages.[10]

## C. Denial of Motion to Alter or Amend Judgment under Rule 59(e)

Although the district court should have ordered a new trial as to damages, it did not abuse its discretion in denying Pittington's motion to alter or amend the jury's damage award under Federal Rule of Civil Procedure 59(e). The Seventh Amendment provides certain civil litigants in federal court the right to have a jury resolve factual issues. *See Dimick v. Schiedt*, 293 U.S. 474, 476 (1935). This constitutional right precludes district courts from granting additur in the event of inadequate damages—i.e., conditioning the denial of a plaintiff's motion for a new trial on the defendant's willingness to pay additional damages—because allowing a district court to "bald[ly] add[] something which in no sense can be said to be included in the verdict" would unduly impinge on the plaintiff's right to have a jury decide the factual issue of damages. *See id.* at 486.[11]

---

[10]The dissent fears that our decision "run[s] the risk of rewarding a strategic choice gone awry" because Pittington could have offered "W-2s, pay subs, [or] tax returns" to corroborate his statements at trial. Dissent Op. at 24. But a litigant is not required to introduce documentary evidence where testimony would suffice. *See R & R Assocs., Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir. 1984) ("No evidentiary rule . . . prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation."). And we worry that affirming the district court's judgment rewards a strategic choice in the other direction. Rather than establishing Pittington's lack of mitigation, Lumberjack's counsel simply remarked in closing that thirty-five weeks of unemployment was "a long time to not get a job in Pigeon Forge." R. 95 (Trial Tr. at 15) (Page ID #3062). Congress, the Supreme Court, and this court have made clear that successful Title VII plaintiffs are presumptively entitled to back pay in the amount that would make them whole. *See Rasimas*, 714 F.2d at 626 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). A defendant should not be able to avoid the consequences of its discriminatory conduct by hinting, after the time for submitting proof has passed, that the plaintiff could have done more to right the defendant's wrongs.

[11]As the Supreme Court explained in *Dimick*, remittitur (conditioning the denial of a defendant's motion for a new trial on the plaintiff's willingness to remit excess damages) is permissible because the amount actually owed was, in a sense, already found by a jury, and remittitur simply "lop[s] off an excrescence." 293 U.S. at 486.

As we have previously acknowledged, other circuits have developed two narrow exceptions to the prohibition against additur. First, additur may be appropriate when the parties would prefer to consent to an increased damages figure rather than proceed to a new trial as to damages. *See Clay v. Gordon*, 205 F.3d 1339, at *3 (6th Cir. 2000) (Table).**[12]** Second, a court may order additur, even without the parties' consent, when "damages claims are definite and incontrovertible," such that there is "no genuine issue as to the correct amount of damages." *See id.* (second quote quoting *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1252 (11th Cir. 1997)); *see also Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989) (holding that "[i]t would be a useless formality to grant a new trial on th[e] issue [of damages if] the trial court would be required to grant summary judgment" for a particular amount that was required as a matter of law), *abrogated on other grounds by Gasperini v. Ctr. for Humanities*, 518 U.S. 415 (1996). The second exception is inapplicable here, as the proofs at trial would have supported a range of back pay awards (even though even the lowest appropriate award is plainly higher than the amount Pittington secured at trial). As to the first exception, we leave it to the district court to determine whether it can reasonably approximate Pittington's damages and secure both parties' consent to that figure. If not, the district court must hold a new trial on damages and ensure that, this time, Pittington's back pay award aligns with the proofs.

## D. Award of Prejudgment Interest

Pittington contends that the district court abused its discretion by awarding prejudgment interest on his back pay award at the rate established by the federal postjudgment statute, 28 U.S.C. § 1961, which equaled 0.66% as of the date of entry of judgment in this case. *See* Appellant Br. at 25–27. According to Pittington, the district court was required to (1) consider case-specific factors in determining the appropriate rate of prejudgment interest, and (2) select a rate that at the very least kept up with the rate of inflation, as anything less would "not make him whole and [would] provide[] a financial windfall to the offending employer." *Id.* at 28–32.

---

**[12]**In *Clay*, we suggested that additur would be appropriate with the plaintiff's consent (rather than the parties' consent), presumably based on the assumption that additur as a remedy presumes that the defendant is willing to pay an increased award in lieu of another trial. For the sake of clarity, we note that under the additur-by-consent exception to *Dimick*, both parties must agree to an increased damages award to avoid implicating Seventh Amendment concerns. *See Dimick*, 293 U.S. at 486 (noting that the Seventh Amendment entitles both parties "to have a jury properly determine . . . the extent of the injury by an assessment of damages").

Lumberjack, in turn, argues that Pittington urged the district court to apply the 10% prejudgment interest rate available to plaintiffs in discrimination cases under Tennessee law, and therefore forfeited the opportunity to argue for a different rate before this court. *See* Appellee Br. at 26–30. In addition, Lumberjack argues that the federal rate set forth in 28 U.S.C. § 1961 was an appropriate rate because it satisfied Title VII's goal of making "victims of discrimination whole and compensat[ing] them for the true cost of money damages they incurred." *City of Warren*, 138 F.3d at 1096 (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170 (6th Cir.), *opinion amended on denial of reh'g,* 97 F.3d 833 (6th Cir. 1996)).

We hold that the district court abused its discretion in applying a prejudgment interest rate of 0.66%. Pittington did not, as Lumberjack and the dissent insist, forfeit its opportunity to argue for a rate other than the 10% maximum authorized by Tennessee law. In response to Lumberjack's argument that the district court should adopt the federal postjudgment interest rate in its briefing before that court, Pittington acknowledged that the district court had discretion over "the applicable interest rate and method of calculation," and urged the court to "compensate him as completely as possible in light of the circumstances of this case[,] . . . [r]egardless of the rate and method the Court chooses to utilize." R. 83 (Pl. Reply in Support of Mot. to Alter/Amend Judgment at 6) (Page ID #2900). In so doing, Pittington adequately argued in favor of a fair rate—even though we agree that he would have been better served if he had provided the district court with some guidance as to what that rate should be.

On the merits, then, the district court failed to consider adequately case-specific factors before applying the federal statutory rate set forth in 28 U.S.C. § 1961, as required by *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685–87 (6th Cir. 2013). As the dissent notes, we have previously recognized that "the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards," *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 735 (6th Cir. 2017) (quoting *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998))—but only if the district court ensures that the "the statutory rate [is] fair," *id.* at 736. To that end, district courts must consider a series of factors before applying the statutory rate, including "the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the

prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Schumacher*, 711 F.3d at 687. This is not to say that all factors will weigh evenly in all cases. For example, where the plaintiff is bound by fiduciary duties to invest conservatively, a court does not abuse its discretion in viewing the low market-interest rates associated with "the safe type of investment that is expected of a fiduciary" as adequate, even if the court fails to "specifically address the [presumably higher] rate of inflation in relation to the treasury bill rate." *Meoli*, 848 F.3d at 736. But even though a court may conclude that certain factors are more pertinent than others under certain circumstances, a court may not apply § 1961 without considering *any* relevant case-specific factors. Here, the district court's analysis was too terse to satisfy even a narrow reading of *Schumacher*'s requirements.

First, the district court observed that Pittington's requested rate of 10% per year "would be a windfall," but failed to examine whether 0.66% would afford Lumberjack a windfall in the opposite direction, *see Pittington*, 2017 WL 1393718, at *3—an error this court has criticized before. *See Schumacher*, 711 F.3d at 687 ("The district court was concerned with an award that would produce a 'windfall' that would punish [the defendants], although it seems that it did the opposite and created a windfall in favor of [the defendant's] wrongdoing."). Second, the district court noted the "low rates of interest and inflation over the relevant period," *Pittington*, 2017 WL 1393718, at *3, but it made no effort to (1) explain which of many possible "low [market] rates of interest" it was considering, or (2) compare those rates to the statutory rate set forth in § 1961. Finally, the district court focused on Pittington's failure to provide evidence as to an appropriate rate. While this criticism was warranted, and may well have justified the district court's refusal to apply the 10% interest rate authorized under Tennessee law, it does not excuse the district court's failure to consider whether the rate that Lumberjack suggested would plainly fail to satisfy Title VII's remedial goals. *See Schumacher*, 711 F.3d at 687.

Admittedly, Pittington's failure to provide any information regarding the lost interest value of the money he was owed made it harder for the district court to determine what prejudgment interest rate would fully compensate Pittington "for the true cost of damages [he] incurred." *See City of Warren*, 138 F.3d at 1096 (quoting *Thurman*, 90 F.3d at 1170). But

"[t]here is no indication that the phrase 'make whole' requires a detailed evidentiary demonstration of what use the [plaintiff] would have made of the money had he received it, and there is no precedent in the Sixth Circuit that such a showing is required . . . in civil litigation." *Rochow v. Life Ins. Co. of N. Am.*, No. 04-73628, 2016 WL 5476240, at *4 (E.D. Mich. Sept. 29, 2016), *reconsideration denied*, No. 04-73628, 2017 WL 4236594 (E.D. Mich. Sept. 25, 2017). Thus, even absent any evidence by Pittington regarding the lost interest value of his damages, the district court abused its discretion when it applied the federal statutory rate provided in § 1961 without considering whether that rate satisfied Title VII's remedial purposes and avoided unjustly enriching the wrongdoer. Given the marked difference between the treasury bill rate prevailing at the time Pittington secured judgment and the average rate of inflation over the relevant time period, it is difficult to see how the § 1961 rate could possibly satisfy those twin goals in this case.[13]

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of Pittington's motion for a new trial on the issue of damages, as the district court abused its discretion by applying an erroneous legal standard in its consideration of Pittington's motion or else made a clear error of judgment in determining that the jury's award was reasonable in light of Pittington's uncontroverted evidence as to damages. We also **REVERSE** the district court's decision to award prejudgment interest at the rate specified by 28 U.S.C. § 1961(a) because the district court failed to consider case-specific factors, such as the effects of inflation and Title VII's remedial goals. We **VACATE** the district court's order, *see* R. 87 (Dist. Ct. Mem. and Order) (Page ID #2955–63), and **REMAND** for further proceedings consistent with this opinion.

---

[13]The dissent believes that Pittington's petition for a fair rate was too vague and too late to preserve the issue for appeal. *See* Dissent Op. at 25–26. But Pittington requested prejudgment interest in his opening brief; he did not then forfeit that request by acknowledging in his reply brief that the district court could decide to award him a lower rate than he believed appropriate. Once a plaintiff asks for prejudgment interest, the trial court must consider case-specific factors to determine what rate would make the plaintiff whole. *See Schumacher*, 711 F.3d at 685–87. A plaintiff's failure to guide the court's analysis may limit his ability to challenge later the way various factors were balanced, but it does not prevent him from appealing a district court's failure to consider relevant case-specific factors at all.

———————————

**DISSENT**

———————————

SUTTON, Circuit Judge, dissenting.  It is tempting to join the court's decision to reverse this $10,000 verdict and to go along with its conclusion that Pittington is entitled to more damages (apparently somewhere between $10,000 and $35,000) and is entitled to more prejudgment interest (apparently something more than $228).  The financial stakes are not high.  But I cannot "rebuke[]" the district court, *supra* at 9, for taking this case as it came to her.  Perhaps because of the relatively small amount of money sought by Pittington, his counsel introduced some evidence of damages and neglected many other sources of evidence, making it exceedingly nebulous for anyone—jury, district court judge, appellate judges—to be sure about what he fairly deserved.  And perhaps because of those modest stakes, his counsel made only one argument about prejudgment interest—that he was entitled to a 10% per year interest award on the judgment, a princely rate of return if you could get it during the time at hand.  Under these circumstances, the district court judge did not exceed her considerable discretion in rejecting Pittington's request for a new trial on damages and in rejecting his request for a 10% prejudgment interest award on the judgment.

*Backpay award.*    Pittington bases his argument on a black-letter principle:  that Lumberjack, the defendant, had the burden to show that he, the plaintiff, failed to mitigate damages.  *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623–24 (6th Cir. 1983).  But he fails to apply that principle correctly.  He first ignores the reality that, in a burden-shifting framework, the burden must shift from somewhere.  In this case, Pittington had to start by showing the amount of pre-mitigation backpay Lumberjack owed within a "reasonable certainty." *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983).  That meant he had to show what wages he received before the discharge.  Despite defense counsel's prodding, he never testified or submitted evidence that he earned more than $8 per hour while working for Lumberjack.  The jury readily could have found that Pittington never proved that he received $10.50 per hour at the time he was fired and thus reduced the pre-mitigation amount accordingly.

If I understand the court's contrary conclusion, it turns on a question asked by Lumberjack's counsel. *See* R. 74 at 48–49 (Defense counsel: "I think—your testimony is, I think, you received two promotions, but did you not go from $8 to $10.50 once you went to a lead, and there was no other pay raises?" Pittington: "I'd have to see the paper. I don't recall off the top of my head."); *supra* at 11–12. But questions are not answers. And questions are not evidence. The only person in the exchange who could answer the question—and provide evidence about the point—was Pittington. Yet he demurred. Before that and after that, for reasons of their own, Pittington and his counsel never introduced evidence on the point during his direct or redirect examination. No W-2s. No pay stubs. No income returns. No documentation of any sort. All of which could make a reasonable jury skeptical about anything Pittington said about jobs and pay. On this record, a jury reasonably could find that he never earned more than $8 per hour.

Pittington next misapprehends Lumberjack's burden. As he sees it, Lumberjack must offer its own evidence—from its own witnesses—to meet its lack-of-mitigation burden. But the rule describes a destination, not the path to take. Lumberjack was free to rely on Pittington's sworn testimony to carry its burden. His statements are record evidence upon which Lumberjack, the jury, and the district court could rely. Pittington testified on direct examination about three different jobs he held after being fired from Lumberjack. A jury could infer from the existence of those jobs that "substantially equivalent positions" existed in Pigeon Forge. *Rasimas*, 714 F.2d at 624. To the extent anyone has concerns about the clarity of that testimony, it must be construed in favor of the verdict. *See Ross v. Meyers*, 883 F.2d 486, 488 (6th Cir. 1989). On top of that, Pittington admitted that he "wouldn't say it's hard to keep a good job" in Pigeon Forge. R. 74 at 6–7. Lumberjack's counsel featured this evidence in his closing argument when he said that 35 weeks, the longest period of unemployment, was "a long time to not get a job in Pigeon Forge." R. 95 at 15–16. And Pittington described his job-seeking efforts during one period of unemployment but conspicuously failed to describe his search during any other periods—including the 35-week stretch. A reasonable jury could infer from his testimony that he "failed to use reasonable care and diligence in seeking such positions." *Rasimas*, 714 F.2d at 624. The best evidence on mitigation came from Pittington's mouth to the jury's ears. The jury was free to listen to it and rely on it.

Pittington also fails to come to grips with the deferential standard of review for challenging the amount of a jury award under Civil Rule 59. The district court may overturn a jury award only if the number is "substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence." *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996). Appellate courts in turn review *that* decision for an abuse of discretion. *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007). Pittington did not meet that doubly deferential standard of review.

The jury's award also makes sense for what it is worth. The district court mentioned one possible path to $10,000, noting that this figure corresponded to what he would have earned between his firing and his first post-Lumberjack job. But there are many others. Try this one. The jury could have looked at the sparse record (Pittington did not submit the paperwork he received during discovery about his job and salary, presumably because it would have *limited* his request for damages) and Pittington's own testimony to use the $8 hourly wage when calculating pre-mitigation backpay. Then it could have multiplied that number by 40 hours per week for 52 weeks per year over three years to establish a pre-mitigation amount of $49,920. Then it could have relied on Pittington's testimony to calculate and deduct post-Lumberjack interim earnings from that gross amount. *See NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 307–08 (6th Cir. 2009). Pittington often gave a range of dates and wages when describing his interim employment and the jury could have based the interim pay calculations on the longest working periods and highest rates he had estimated. *See, e.g.*, R. 74 at 3 (noting that he left Perry Smith "[m]aybe the end of August, beginning of September" of 2013). Then it could have calculated that Pittington earned $7.25 per hour for six months' work at Perry Smith Development, two payments of $500 from Cyrus Family Theater, and $600 per week over nine months from Sablé Equestrian Theater for a total interim income of $28,980. That would leave $20,940. Next the jury could have relied on Pittington's concession that it is not hard to get a job in Pigeon Forge and that he could not explain how, or if, any job search efforts came up short, to decide that he failed to mitigate damages during the 35-week stretch of unemployment. The jury could then have subtracted $11,200 from the $20,940 to account for that failure to mitigate, which gets to a rough (rounded up) award of $10,000.

The exact path to $10,000 of course does not matter. What matters is that the path, indeed paths, exist. *See Anchor*, 94 F.3d at 1021. The evidence does not show that the jury unquestionably erred.

Any other approach runs the risk of disrespecting the jury's and district court's ring-side view of the case. We review transcripts for a living. They review witnesses and their credibility for a living. We have a comparative advantage on law. They have comparative advantages on facts. Pittington does not challenge a single jury instruction. He challenges only how the jury and district court saw the evidence. No appellate court can recreate what the jury saw and the trial judge witnessed, which is why the standard of review is so deferential and why it is so unconventional to reverse jury trial awards.

It's not just disrespect of juries and trial judges that should concern us. We also run the risk of rewarding a strategic choice gone awry. Pittington chose not to add W-2s, pay stubs, tax returns, or other typical evidence to the record. Perhaps he feared what those documents might reveal about his pay, working hours, or relationship with Lumberjack—including matters that might go to whether the underlying merits of his claim were even valid. Just the same, he chose not to propose alternative methods by which the jury might have calculated an award. He just asked for $40,000, which the majority agrees would have been too much. Perhaps he feared that the jury would seize on any alternative that might result in a lower number. All we know for sure, and all that matters, is that he chose to rely on spotty testimony and his lawyer's skill to make the case that $40,000 was the correct amount. By making that strategic choice, he forfeited the opportunity to present additional evidence or argue in the alternative for different amounts. *See Estate of Quirk v. Comm'r of Internal Revenue*, 928 F.2d 751, 758 (6th Cir. 1991).

The jury was free to review the evidence and decide what amount of damages he had shown, including perhaps by compromising among competing ways of looking at the evidence from the perspective of the individual jurors. If reasonable judges can see the same case differently, it shouldn't surprise anyone that reasonable jurors sometimes see the same evidence differently. And we should respect efforts to resolve those differences so long as the final outcome hews to the bounds of plausibility. As the Seventh Circuit has pointed out in a different context, but one also focused on deference, "a decision must strike us as more than just maybe or

probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). Perhaps that overstates matters, both the olfactory role in reviewing jury verdicts and the stench needed to second guess a jury and trial judge. But you get the idea. Something must go seriously awry before we will reverse a jury's and district court's unimpeded view of the evidence and their assessment of it. No such problem happened here. I would respect the verdict.

*Pre-judgment interest.* Our review of a district court's decision about pre-judgment interest also is deferential—and also rarely reversed. The court may award pre-judgment interest "at its discretion in accordance with general equitable principles," and we again review the decision for an abuse of discretion. *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir. 2000). A district court may apply the post-judgment rate under 28 U.S.C. § 1961 if the court finds it warranted after considering case-specific factors such as inflation, interest rates, the possibility of a windfall payment, and the goal of making the plaintiff whole. *See Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 686 (6th Cir. 2013). The district court chose the federal rate only after explicitly highlighting those factors in its opinion. R. 87 at 6 ("The court finds that plaintiff's request for interest at the effective rate of 10% per annum, which is permissible under Tennessee law, would be a windfall, particularly in light of the low rates of interest and inflation over the relevant period."); *see supra* at 18–20. This was not the first district court to apply § 1961 to pre-judgment awards, and we have blessed that choice before. *See, e.g., Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998). No abuse of discretion happened here either.

Making the case easier, Pittington forfeited any contrary argument. In what looks like another strategic decision, Pittington argued only for the 10% rate when he moved to alter the judgment. Nowhere in his briefs did he argue below that the district court should have used any other method to calculate pre-judgment interest if the state rate seemed too high. He instead limited his claim to the highest amount for which he could realistically hope: the state rate. Generally speaking, district courts do not make reversible errors when they ignore arguments never made.

In reaching a contrary conclusion, the court seizes on this language in Pittington's lower court briefs: "Regardless of the rate and method the Court chooses to utilize, Mr. Pittington simply requests that the Court compensate him as completely as possible in light of the circumstances of this case." R. 83 at 6; *supra* at 18. That does not suffice to preserve this argument or any other for appeal. A litigant does not preserve an argument by making a general request for relief. Even that general idea, worse yet, made its first appearance in a reply brief, which does not preserve an issue for appeal anyway. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

The court seeing it differently, I respectfully dissent.